UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____X

B.D.S., a child with a disability, Individually and
by mother, Donna Dzugas-Smith, and
DONNA DZUGAS-SMITH,

                 Plaintiffs,

      -against-

SOUTHOLD UNION FREE SCHOOL DISTRICT,
DR. CHRISTOPHER GALLAGHER, VIRGINIA
THOMPSON, RICHARD CAGGIANO, PAULETTE
OFRAIS, JUDI FOUCHET, DR. ROBERT WALSH,
JEANANNE DEMPSEY, PATRICIA MELLAS,
LORI CARIELLO, DAVID RIDDELL, PAUL KELLY,
INGERMAN AND SMITH L.L.P., ELAINE WHITE,
and SCOTT DESIMONE,

                 Defendants.

_____X

CV-08-1319 (SJF)(WDW)
Action No. 1

**OPINION & ORDER**

B.D.S., a child with a disability, Individually and
by mother, Donna Dzugas-Smith, and
DONNA DZUGAS-SMITH,

                 Plaintiffs,

      -against-

SOUTHOLD UNION FREE SCHOOL DISTRICT,
DR. CHRISTOPHER GALLAGHER, VIRGINIA
THOMPSON, RICHARD CAGGIANO, PAULETTE
OFRAIS, JUDI FOUCHET, DR. ROBERT WALSH,
JEANNE DEMPSEY, PATTI MELLAS, DAVID RIDDELL,
PAUL KELLY, INGERMAN AND SMITH L.L.P.,
ELAINE WHITE, SCOTT DESIMONE, SUSAN NOBILE,
GAIL ANDREWS BUTTA, MARY FITZPATRICK,
MARY LOU CAHILL, BRUCE KOLLMAR, and
NEW YORK STATE EDUCATION DEPARTMENT,

                 Defendants.

_____X

CV-08-1864 (SJF)(WDW)
Action No. 2

FEUERSTEIN, J.

On April 1, 2008, *pro se* plaintiff Donna Dzugas-Smith ("plaintiff") commenced action number one (1) ("Action No. 1"), individually and on behalf of her child "B.D.S." ("the infant plaintiff") (collectively, "plaintiffs"), against defendants Southold Union Free School District, Dr. Christopher Gallagher, Virginia Thompson, Richard Caggiano, Paulette Ofrias, Judi Fouchet, Dr. Robert Walsh, Jeananne Dempsey, Patricia Mellas, Lori Cariello, David Riddell, Elaine White and Scott Desimone, (collectively, the "UFSD defendants"), State Review Officer Paul F. Kelly ("Kelly") and Ingerman and Smith L.L.P. ("Ingerman Smith") (collectively, "defendants"). On June 26, 2008, plaintiffs filed an amended complaint against defendants alleging violations of, *inter alia*, the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. § 792, *et seq.*; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 ("Section 1983") and 1985 ("Section 1985"); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*; New York Education Law §§ 4401, *et seq.* ("New York Education Law"); and the New York State Constitution Article XI, § 1 ("New York Constitution").

On May 8, 2008, *pro se* plaintiff commenced action number two (2) ("Action No. 2"), individually and on behalf of the infant plaintiff, against all of the same defendants as named in Action No. 1, as well as against Susan Nobile, Gail Andrews Butta, Mary Fitzpatrick, Mary Lou Cahill and Bruce Kollmar (collectively, "the additional UFSD defendants") and the New York State Education Department ("NYSED") (collectively, "the second defendants"). On September 4, 2008, plaintiffs filed an amended complaint against the second defendants alleging violations of, *inter alia*, the IDEA, the Rehabilitation Act, Section 1983, 42 U.S.C. § 1988 ("Section 1988"), the ADA, the New York Education Law and the New York Constitution.

Kelly now moves pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure to dismiss the complaint against him for lack of jurisdiction and failure to state a claim, respectively. Ingerman Smith moves pursuant to Rule 42(a) of the Federal Rules of Civil Procedure to consolidate the two actions and pursuant to Rules 12(b) and (c) of the Federal Rules of Civil Procedure to dismiss the complaint as against it.[1] Plaintiffs have not opposed either motion. For the reasons stated herein, Ingerman Smith's and Kelly's motions are granted in part and denied in part.

## I.    Background

### A.    Factual Background[2]

#### 1.    The Parties

The infant plaintiff is currently fifteen (15) years old, having been born on July 5, 1994. (Amended Complaint in Action No. 1 [Compl. No. 1], ¶ 3.1; Amended Complaint in Action No. 2 [Compl. No. 2], ¶ 3.1). At all relevant times, the infant plaintiff was enrolled as a student in defendant Southold Union Free School District (the "UFSD"). (Compl. Nos. 1 and 2 [collectively, "Compl."], ¶ 3.1). Plaintiff is the mother and natural guardian of the infant plaintiff. (Compl., ¶ 3.2). According to plaintiffs, the infant plaintiff has "difficulties in the area

---

[1]  By order dated November 6, 2008, this Court referred Ingerman Smith's motion to consolidate filed in Action No. 2 to Magistrate Judge William D. Wall. In light of the determination herein, that referral order is hereby vacated.

[2]  As is required on a motion to dismiss pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure, the factual allegations in the amended complaints, though disputed by defendants, are accepted to be true for purposes of this motion, and all reasonable inferences are drawn therefrom in favor of plaintiffs. They do not constitute findings of fact by this court.

of auditory figure-ground listening, integration, phonemic awareness, organization, short-term memory, comprehension, receptive and expressive language * * * [and] speech-language impairments which impact in her reading ability * * * compounded by her dyslexia, in attention [sic] and learning deficits." (Compl. No. 1, ¶ 5.6).

Defendant Virginia Thompson ("Thompson") was, at all relevant times, the Director of Special Education ("Special Ed"), the Chairperson of the Committee of Special Education ("CSE") and the Administrator of Pupil Personnel Services ("PPS") for the UFSD. (Compl., ¶ 3.4),

Defendant Dr. Christopher Gallagher ("Gallagher") was, at all relevant times, the Superintendent of the UFSD. (Compl., ¶ 3.5).

Defendant David Riddell was, at all relevant times, the Special Education teacher at the UFSD designated on the infant plaintiff's Independent Education Plan ("IEP"). (Compl., ¶ 3.6).

Defendant Laurie Cariello ("Cariello") was, at all relevant times, the English Language Arts teacher of the sixth (6th) grade "teaching team" of the UFSD and was the infant plaintiff's English Language Arts teacher during the 2005-2006 school year. (Compl. No. 1, ¶ 3.7).

Defendant Jeananne Dempsey, a/k/a Jeanne Dempsey ("Dempsey"), was, at all relevant times, the Science and Math teacher of the sixth (6th) grade "teaching team" of the UFSD and was the infant plaintiff's teacher for homeroom, science and math during the 2005-2006 school year. (Compl., ¶ 3.8).

Defendant Patricia Mellas, a/k/a Patti Mellas ("Mellas"), was, at all relevant times, the Social Studies teacher of the sixth (6th) grade "teaching team" of the UFSD and was the infant plaintiff's social studies teacher during the 2005-2006 school year. (Compl., ¶ 3.9).

4

Defendant Elaine White ("White") was, at all relevant times, the school psychologist at Southold Elementary School. (Compl. No. 1, ¶ 3.17; Compl., No. 2, ¶ 3.13).

At all relevant times, the Board of Education of the UFSD was comprised of the following defendants: Richard Caggiano ("Caggiano") as President, and Paulette Ofrias ("Ofrias"), Judi Fouchet ("Fouchet"), Dr. Robert Walsh ("Walsh") and Scott DeSimone ("DeSimone") as members (collectively, the "BOE defendants"). (Compl. No. 1, ¶¶ 3.12-3.16; Compl. No. 2, ¶¶ 3.16-3.20).

Ingerman Smith was, at all relevant times, legal counsel for the UFSD during the administrative proceedings. (Compl. No. 1, ¶ 3.10; Compl. No. 2, ¶ 3.14).

Kelly was, at all relevant times, the New York State Review Officer ("SRO"). (Compl. No. 1, ¶ 3.11; Compl. No. 2, ¶ 3.15).

Defendant Susan Nobile ("Nobile") was, at all relevant times, the Reading Specialist and "Rebuttal Witness" of the UFSD. (Compl. No. 2, ¶ 3.7).

Defendant Mary Fitzpatrick ("Fitzpatrick") was, at all relevant times, the Principal and Building Administrator of the UFSD Junior/Senior High School. (Compl. No. 2, ¶ 3.10).

Defendant Gail Andrews Butta ("Butta") was, at all relevant times, the head of Special Education in the UFSD Junior/Senior High School. (Compl. No. 2, ¶ 3.11).

Defendant Mary Lou Cahill ("Cahill") was, at all relevant times, the Special Education teacher assigned to the infant plaintiff by the UFSD. (Compl. No. 2, ¶ 3.12).

Defendant Bruce Kollmar was, at all relevant times, the "Out of District CSE Chairperson" under contract with the UFSD. (Compl. No. 2, ¶ 3.21).

5

## 2. Factual Allegations

Plaintiffs allege that in 1999, the infant plaintiff entered the UFSD as a "classified preschooler," but was unilaterally declassified by the UFSD's CSE, chaired by Thompson. (Compl., ¶ 5.7). According to plaintiffs, the infant plaintiff struggled through kindergarten, then attended the UFSD's summer school program during the summer of 2000 upon the recommendation of the UFSD. (Compl., ¶ 5.8).

In September 2000, the infant plaintiff was placed on a "§ 504 Accommodation Plan ["Accommodation Plan"] and placed in a First Grade Inclusion Class." (Compl., ¶ 5.9). According to plaintiffs, the infant plaintiff struggled through first grade, then attended the UFSD's summer school program during the summer of 2001. (Compl., ¶ 5.10).

In June 2002, the UFSD discharged the infant plaintiff from her Accommodation Plan, but recommended that she attend the UFSD's summer school program during the summer of 2002, which she did. (Compl., ¶ 5.11).

Plaintiffs allege that the UFSD did not agree to classify the infant plaintiff as learning disabled until July 2002, after the infant plaintiff's parents obtained an independent neuropsychological evaluation diagnosing the infant plaintiff "as a 'double deficit' reader who has difficulties with not only phonological awareness and integration, but also with the automaticity and fluency skills that are needed for skilled reading." (Compl., ¶ 5.12).

In accordance with the infant plaintiff's August 2002 IEP, the infant plaintiff was placed in a third (3rd) grade "Inclusion class * * * with pull-outs for reading, speech, and writing skills." (Compl., ¶ 5.13).

The same neuropsychologist re-evaluated the infant plaintiff in July 2003 and found that

"after intensive intervention [the infant plaintiff] made less than half a year's progress in one school year. * * * 'According to current research, these readers are considered likely to have long term difficulty with reading and writing skills and require the most intensive and long term interventions to help them improve.'" (Compl., ¶ 5.14 [quoting the neuropsychologist's report]). As a result, the infant plaintiff's parents enrolled the infant plaintiff in "an intensive Linda Mood Bell Program (LMB) which was for 5 [five] days a week, 4 [four] hours daily for 6 [six] and one half weeks during the 2003 summer." (Compl., ¶ 5.14). According to plaintiffs, after attending the LMB program, the infant plaintiff entered the fourth (4th) grade reading at a fourth (4th) grade level. (Compl., ¶ 5.15).

Plaintiffs allege that on February 5, 2004, they requested that the CSE approve additional reading services at LMB because the infant plaintiff "need[ed] to be reminded how to read." (Compl. No. 1, ¶ 5.16; Compl. No. 2, ¶ 5.17). According to plaintiffs, the UFSD denied additional reading services for the infant plaintiff without providing her parents with prior written notice. (Compl. No. 1, ¶¶ 5.16-5.17; Compl. No. 2, ¶¶ 5.17-5.18). Following the infant plaintiff's fourth (4th) grade year, her teacher indicated that the infant plaintiff "continues to need help with auditory processing and memory * * * [and] needs guidance to include only relevant information, to summarize, organize her thoughts * * *. During this year [the infant plaintiff] 'attended extra help sessions * * * all year consistently.'" (Compl. No. 1, ¶ 5.18; Compl. No. 2, ¶ 5.16).

Plaintiffs allege that in fifth (5th) grade, which commenced in September 2004, the infant plaintiff "not only showed regression, but maintained this regression according to scores on testing done by [the UFSD's] reading specialist, [Nobile]." (Compl., ¶ 5.19).

7

According to plaintiffs, following their request for a Central Auditory Processing ("CAP") evaluation, the infant plaintiff was diagnosed by Dr. Donna Geffner ("Geffner") with a CAP Disorder ("CAPD") which "contributes to her language based learning disability and reading disorder (dyslexia)." (Compl., ¶ 5.20). According to Geffner, upon entering the fifth (5th) grade, the infant plaintiff's decoding skills were below third (3rd) grade level and the infant plaintiff was regressing from the skills she had acquired the previous year. (Compl., ¶ 5.20). Plaintiffs allege that "an auditory trainer (FM System) * * * was added to [the infant plaintiff's] IEP" after the UFSD's independent evaluator, Anne E. Gordon ("Gordon"), concurred with Geffner's findings and recommendations. (Compl., ¶ 5.21).

Plaintiffs allege that Nobile recommended discharging the infant plaintiff from reading services on December 17, 2004, notwithstanding the new evaluations. (Compl., ¶ 5.22).

On January 19, 2005, the consensus of the CSE was to increase services beginning in February 2005 by, *inter alia*, adding a one-to-one reading tutor and one-to-one speech therapy twice weekly with outside providers Geraldine Catapano ("Catapano") and Louise Ramsey ("Ramsey"), respectively. (Compl. No. 1, ¶¶ 5.22-5.23; Compl. No. 2, ¶¶ 5.23-). These additional services were to continue throughout the summer and the sixth (6th) grade. (Compl., ¶ 5.24). In addition, the CSE "approved an Assistive Technology (AT) Evaluation, a CAPD Re-Evaluation and acknowledged their responsibility to perform [the infant plaintiff's] triennial evaluation that summer." (Compl., ¶ 5.24).

Plaintiffs allege that at the summer CSE meeting on May 11, 2005, Ramsey reported, *inter alia*, that the infant plaintiff demonstrated a "[s]ignificant weakness regarding auditory processing and auditory memory and word recall weakness" and that the infant plaintiff "is a

multi-sensory learner. She needs to use an auditory trainer in the classroom." (Compl., ¶ 5.25). The infant plaintiff received the additional reading services twice weekly for eight (8) weeks and the additional speech services twice weekly for six (6) weeks during the summer of 2005. (Compl., ¶ 5.26).

Plaintiffs allege that when the infant plaintiff commenced sixth (6th) grade in September 2005, her IEP was not implemented insofar as the FM system provided to her did not function, she did not receive one-to-one reading instruction and "[r]esource room did not begin." (Compl., ¶ 5.27). Plaintiff contacted Thompson in an effort to implement the infant plaintiff's IEP and, beginning in October 2005, communicated with four (4) of the teachers in the sixth (6th) grade "teaching team," Cariello, Thompson, Riddell and Mellas, to, *inter alia*, express her concerns that the infant plaintiff was struggling with the workload. (Compl., ¶¶ 5.28-5.32).

Plaintiffs allege that White commenced the infant plaintiff's triennial testing in November 2005, but never provided her parents with a copy of the evaluation until the March 9, 2006 CSE meeting. (Compl. ¶ 5.33).

Plaintiffs allege that on December 5, 2005, plaintiff requested a CSE meeting to review the triennial evaluation, but that Thompson delayed the meeting claiming that she was waiting for "AT" and speech/language evaluations, which had not even been scheduled. (Compl., ¶ 5.34). Plaintiffs allege that Thompson further delayed scheduling the CSE meeting until March 9, 2006, notwithstanding that the "AT" report by Tom Rosati ("Rosati") was dated December 27, 2005, the infant plaintiff's re-evaluation for CAPD was completed on December 20, 2005, the Listening Inventories that Geffner requested of the infant plaintiff's teachers were completed by January 3, 2006 and the Landmark School recommendation forms had been completed by the

infant plaintiff's teachers and elementary school principal. (Compl., ¶¶ 5.35-5.40). Plaintiff requested that all evaluators participate in the review and allow for a follow-up meeting in the event that the CSE did not agree with their recommendations. (Compl., ¶ 5.40).

Plaintiffs allege that during the March 9, 2006 CSE meeting, White reviewed and presented her own psycho-educational evaluation, as well as the AT evaluation of Rosati and the CAPD re-evaluation by Geffner. (Compl., ¶ 5.41). According to plaintiffs, plaintiff had not received copies of any of those evaluations prior to the meeting. (Compl., ¶ 5.41). Plaintiffs allege that White agreed with Geffner's opinion that the infant plaintiff has syllabication problems and "a discrepancy to her ability and her achievement;" that Geffner further reported concerns with the infant plaintiff's "fluency, automaticity, short term memory, auditory comprehension, sequencing, proficiency to complete tasks compared to peers * * *," which "impact[] on her academics;" that Cariello acknowledged the infant plaintiff's struggle with language and reading; that there was "a consensus that the [infant plaintiff] was struggling," but that her "deficits continued to significantly impact on her overall academic success;" and that Thompson, *inter alia*, indicated that the infant plaintiff "has a language-based learning disability" and delayed proficiency in computing tasks. (Compl., ¶¶ 5.42-5.45). According to plaintiffs, Thompson indicated that although Geffner recommended "ESY [Extended School Year] at Landmark School," she offered only "1:1 tutoring [in speech and reading] during the summer." (Compl. No. 1, ¶ 5.46). The CSE agreed to reconvene following the Landmark School assessment. (Compl., ¶ 5.47).

Plaintiffs allege that on March 31, 2006, plaintiff met with the sixth (6th) grade teaching team, which prepared notes ahead of the meeting and forwarded them to Thompson. (Compl., ¶¶

10

5.48-5.50).

Plaintiffs allege that plaintiff was never provided with a copy of an e-mail dated April 24, 2006 from Kinahan to Thompson regarding placement of the infant plaintiff at the Landmark School until demand was made therefor by plaintiff's attorney. (Compl., ¶ 5.50).

The CSE reconvened on April 26, 2006 to discuss the Landmark School assessment. (Compl., ¶ 5.52). According to plaintiffs, Mr. Hicks, who presented the assessment, indicated, *inter alia*, that the infant plaintiff's reading rate was at the sixteenth (16th) percentile and her accuracy and fluency were at the ninth (9th) percentile, indicating that the infant plaintiff "was not yet able to generalize this information and apply it to real world reading skills, contextual reading." (Compl., ¶ 5.52). Plaintiffs allege that "the meeting concluded with the CSE agreeing that [the infant plaintiff] should attend Landmark Summer School to address [the infant plaintiff's] academic, social and emotional needs." (Compl., ¶ 5.53). According to plaintiffs, Thompson and White offered to provide the Landmark School summer program as an Academic Intervention Service ("AIS") because they did not believe that the infant plaintiff fit the criteria for the NYSED's twelve (12) month programming. (Compl., ¶ 5.54). Plaintiffs allege that plaintiff expressed her concern that AIS was a general education service, which could be canceled if the school budget did not pass. (Compl., ¶ 5.56).

According to plaintiffs, no goals were reviewed and no program was developed for the 2006-2007 school year during the May 26, 2006 CSE annual meeting. (Compl. No. 1, ¶ 5.57). Plaintiffs allege that before the end of the 2005-2006 school year, plaintiff contacted Gallagher and Thompson regarding, *inter alia*, her concerns that the infant plaintiff's IEP was not being followed. (Compl. No. 1, ¶¶ 5.58-5.59).

The infant plaintiff attended the Landmark School as an entering seventh (7th) grade student. (Compl. No. 1, ¶ 5.60). According to plaintiffs, in July 2006 plaintiff received the 2005-2006 progress report, which indicated that only two (2) out of the twenty-nine (29) goals set therein had been achieved. (Compl. No. 1, ¶ 5.61). Plaintiffs further allege that during a July 31, 2006 meeting, the CSE discussed placing the infant plaintiff at Landmark School for the fall of 2006, but Thompson "cut off consideration of this program by announcing the [UFSD's] recommendation of adding a tutorial to their program." (Compl. No. 1, ¶ 5.63). According to plaintiffs, Thompson agreed that the UFSD had failed to provide an appropriate program for the infant plaintiff up to that point, that the infant plaintiff's previous IEPs had not been followed and that the UFSD did not have staff qualified to provide a one-to-one tutorial service in speech and reading. (Compl. No. 1, ¶ 5.63; Compl. No. 2, ¶ 5.60).

Plaintiffs allege that Gallagher refused her subsequent attempts to arrange a CSE meeting after July 31, 2006 "due to budgetary concerns." (Compl. No. 1, ¶¶ 5.64, 5.68; Compl. No. 2, ¶ 5.61). According to plaintiffs, Thompson never procured the necessary FM system and the infant plaintiff was never provided with a laptop adequate for her needs. (Compl. No. 1, ¶ 5.65-5.66; Compl. No. 2, ¶¶ 5.62-5.63). In addition, plaintiffs allege that "[t]he laptop contract the [UFSD] created and expected [the infant plaintiff's] parents to sign stated that they were to return the laptop in better condition then [sic] they received it * * * [and] would be responsible for all repairs and maintenance of the laptop." (Compl. No. 1, ¶ 5.67). According to plaintiffs, the infant plaintiff did not receive an appropriate computer until October 17, 2006 and Thompson never hired a person qualified to provide one-to-one tutorial services. (Compl. No. 1, ¶ 5.72; Compl. No. 2, ¶ 5.66).

12

Plaintiffs allege that during the June 15, 2007 CSE meeting, Butta testified, *inter alia*: that she never taught or met the infant plaintiff; she did not review the infant plaintiff's educational file; she did not teach eighth (8th) grade; and she was a special education and inclusion teacher in the UFSD High School, not a reading specialist. (Compl. No. 2, ¶¶ 5.70-5.72). According to plaintiffs, Kelly did not consider Butta's testimony in his decision. (Compl. No. 2, ¶ 5.73). Plaintiffs also allege that Cahill testified at the meeting as a special education teacher, and testified, *inter alia*: that she did not know the requirements for Extended School Year ("ESY") or the appropriate methodologies to teach the infant plaintiff; that she was not a reading specialist or certified reading teacher; that the infant plaintiff was on grade level for reading; that she agreed with the Landmark School assessment concerning the infant plaintiff's present level of performance and proposed goals and services; and that she was not creating a program for the infant plaintiff, notwithstanding that Thompson had indicated that she would be the special education teacher responsible for implementing the infant plaintiff's IEP. (Compl. No. 2, ¶¶5.75-5.82).

Plaintiffs allege that during the June 15, 2007 CSE meeting, Thompson declared that the infant plaintiff did not qualify for EYS and denied the infant plaintiff's parents' request to approve the same level of summer service for the summer of 2007 as had been provided to the infant plaintiff during the summer of 2006. (Compl. No. 2, ¶¶ 5.85-5.87). Plaintiffs allege that "[o]nly after persistent requesting by [plaintiff] was a resolution session finally scheduled for July 16, 2007." (Compl. No. 2, ¶ 5.92). According to plaintiffs, Thompson was the only attendee from the UFSD at the resolution session and she offered only one-to-one AIS reading instruction sessions for one (1) hour three (3) times a week for eight (8) weeks, although she did

not know who would supply that service or what methodology would be used, and she "had no new offers or suggestions or rationale for the [UFSD's] denial of summer services at Landmark School similar to the previous summer services approved by [the UFSD]." (Compl. No. 2, ¶¶ 5.87, 5.93-5.95). In addition, plaintiffs allege that Thompson agreed to additional neuropsychological testing and CAP re-evaluation, but only by evaluators chosen by the UFSD. (Compl. No. 2, ¶ 5.96).

According to plaintiffs, the infant plaintiff did not receive any services during the summer of 2007 because the UFSD never contacted the infant plaintiff's parents to arrange for such services. (Compl. No. 2, ¶ 5.100). Neuropsychological testing conducted by Dr. Davidovicz in August 2007 and testing performed by Landmark School in September 2007 demonstrated a regression in the infant plaintiff's reading fluency, rate and accuracy as compared to the spring of 2007. (Compl. No. 2, ¶ 5.101).

Plaintiffs allege that less than forty-eight (48) hours before the next CSE meeting scheduled in November 2007, the UFSD cancelled the meeting on the basis that Kollmar needed to be approved as chairperson of "Out of District CSE meetings" by the BOE that evening. (Compl. No. 2, ¶¶ 5.107-5.108). Kollmar chaired CSE meetings held in December 2007 and January 2008, but a consensus was never reached. (Compl. No. 2, ¶¶ 5.109-5.111).

Plaintiffs allege that on or about March 13, 2008, Thompson, Mrs. Parrish, the attendance clerk at the UFSD, Fitzpatrick and Mrs. Field, the guidance counselor at the UFSD, were notified that the infant plaintiff would be returning to classes at the UFSD the following week because her family could no longer afford the tuition payment at Landmark School and that the infant plaintiff's IEP was to "be implemented immediately upon her return to [the UFSD]." (Compl.

No. 1, ¶ 5.90). According to plaintiffs, the infant plaintiff attended the UFSD Junior/Senior High School from March 16 until March 18, 2008 but her IEP was not implemented, as a result of which the infant plaintiff "expressed increasing concern, anxiety and depression." (Compl. No. 1, ¶¶ 5.91-5.94; Compl. No. 2, ¶¶ 5.112-5.113). In addition, the infant plaintiff reported that "she was shunned by her former sixth grade teachers at a school assembly * * *[,] her peers did not include or invite her to be involved in peer gatherings[,] * * * [and] her greetings in passing to school professionals who knew her from earlier grades were ignored." (Compl. No. 1, ¶ 5.94). Plaintiffs allege that during the entire week in March 2008 that the infant plaintiff attended the UFSD school, Fitzpatrick, Thompson and all of her teachers, except her English and Home and Careers teachers, ignored her parents' attempts to communicate with them pursuant to an "administrative directive [that had been] given to not communicate with [the infant plaintiff's] parents." (Compl. No. 1, ¶ 5.96). During the time that she attended the UFSD in March 2008, the infant plaintiff resided in her family home, which lies within the UFSD boundaries. (Compl. No. 1, ¶ 5.95).

On March 21, 2008, written notice was provided to the UFSD that the infant plaintiff would return to Landmark School because of the UFSD's continued failure to implement her IEP. (Compl. No. 1, ¶ 5.97). On March 27, 2008, plaintiff received written confirmation from Thompson that the UFSD would not be able to implement the infant plaintiff's IEP "for at least a few more weeks." (Compl. No. 1, ¶ 5.98).

Plaintiffs allege that Kollmar chaired a third CSE meeting on May 6, 2008, at which Dr. Davidovicz was not present, Dr. Geffner supported summer services at Landmark School and the speech pathologist chosen by the UFSD to attend the meeting had never met the infant plaintiff.

15

(Compl. No. 2, ¶¶ 5.114-5.116). According to plaintiffs, the UFSD psychologist who attended the meeting indicated that Kollmar had not chaired meetings for any student except the infant plaintiff. (Compl. No. 2, ¶ 5.117).

Plaintiffs allege that on four (4) occasions between May 2007 and April 2008, Gallagher "initiated a residency investigation for [plaintiffs]" without obtaining approval of the BOE. (Compl. No. 1, ¶ 5.89). By letter dated May 7, 2008, Gallagher advised plaintiffs that he had made a "preliminary conclusion" that the infant plaintiff was not a resident of the UFSD, but refused to provide plaintiffs with copies of the private investigators' reports upon which he based his conclusion. (Compl. No. 1, ¶¶ 5.99-5.102, 5.110-5.111, 5.115, 5.117).

On May 20, 2008, plaintiff was denied her right to vote for the UFSD budget and BOE candidates based upon a challenge to her residency by Gallagher. (Compl. No. 1, ¶¶ 5.103-5.107).

On May 22, 2008, the infant plaintiff's annual CSE was held, but no IEP was drafted or approved. (Compl. No. 1, ¶ 5.108). According to plaintiffs, on May 28, 2008, the BOE defendants approved services and placement for the infant plaintiff without approval by the CSE, an IEP or parental input. (Compl. No. 1, ¶ 5.109).

Plaintiffs allege that on June 18, 2008, DeSimone "retaliated" against them by failing to accept and approve the recommendations of the CSE for the infant plaintiff's sibling. (Compl. No. 1, ¶¶ 5.113-5.114).

Plaintiffs further allege, *inter alia*, that throughout the three (3) schools years between 2005 and 2008, Gallagher, Thompson and the BOE defendants ignored plaintiff's requests for information "relevant to [the infant plaintiff's] right to her FAPE [free appropriate public

16

education]," (Compl. No. 1, ¶ 5.86), and that Gallagher and Caggiano provided "information concerning the family of [the infant plaintiff] which more often than not was grossly inaccurate * * * inflammatory and slanderous * * *" to a newspaper. (Compl. No. 1, ¶ 5.88). In addition, plaintiffs allege that during the 2006-2007 and 2007-2008 school years, Gallagher, Thompson and the BOE defendants "attempted to harass, intimidate, and retaliate [against plaintiff] for advocating for [the infant plaintiff's] right to a FAPE." (Compl. No. 1, ¶ 5.87).

　　　　　　3.　　Administrative Proceedings

　　　　　　　　a.　　Complaint No. 1

On August 18, 2006, "the [infant plaintiff's] parents requested a due process hearing, alleging a denial of a free appropriate public education ("FAPE") for the 2006-2007 school year and demanding reimbursement for [the infant plaintiff's] tuition at Landmark, where she remained at parental expense." (Compl. No. 1, ¶ 5.70; Compl. No. 2, ¶ 5.64).

During the period between October 23, 2006 and April 27, 2007, an eight (8) day hearing was conducted, upon plaintiff's demand, before Impartial Hearing Officer Michael Lazan ("IHO Lazan"), based upon plaintiff's disagreement with, *inter alia*, "the program, placement, evaluations or implementation of [the infant plaintiff's] IEP for the 2005-2006 school year" and request for pendency and reimbursement for tuition at the Landmark School for the 2006-2007 school year. (Compl. No. 1, ¶¶ 4.1-4.3, 5.74-5.75; Compl. No. 2, ¶ 5.67). By decision dated January 17, 2007, IHO Lazan, *inter alia*, denied plaintiff's request for pendency. (Compl. No. 1, ¶ 4.4). That decision was never appealed. (Compl. No. 1, ¶ 4.4). By decision dated September 5, 2007, IHO Lazan, *inter alia*, denied plaintiff's request for reimbursement of the infant

plaintiff's tuition at Landmark School. (Compl. No. 1, ¶ 4.5).

On October 13, 2007, plaintiffs filed a petition for review of the September 5, 2007 decision to the New York State Education Department State Review Office ("NYSRO") pursuant to 20 U.S.C. § 1415(g). (Compl. No. 1, ¶ 4.6). According to plaintiffs, the UFSD and Ingerman Smith failed to timely send a complete hearing record to the NYSRO, "caus[ing] unnecessary delay in the appeal process" and "denying [the infant plaintiff] her due process rights for her FAPE." (Compl. No. 1, ¶¶ 5.77-5.78, 5.83). Plaintiffs further allege that during the appeals process, Gallagher, Thompson and the BOE defendants "discriminated against [the infant plaintiff] by the hiring of [Kollmar] to be the CSE Chairperson for 'Out of District CSEs.'" (Compl. No. 1, ¶ 5.84). According to plaintiffs, Kollmar did not chair CSE meetings for any "Out of District" UFSD student except the infant plaintiff. (Compl. No. 1, ¶¶ 5.84-5.85). In addition, plaintiffs allege that those defendants "harassed, intimidated and retaliated against [plaintiff] by delaying requests to hold CSE meetings and by hiring Bruce Kollmar to chair the delayed meetings." (Compl. No. 1, ¶ 5.85).

By decision dated January 3, 2008, Kelly dismissed the appeal of IHO Lazan's decision denying plaintiff's request for reimbursement of tuition costs at Landmark School. (Compl. No. 1, ¶ 4.7).


b.    Complaint No. 2

On June 22, 2007, plaintiffs filed a demand for a due process hearing on the grounds, *inter alia*, that the infant plaintiff's parents did not agree with "the program, placement evaluations or implementation of [the infant plaintiff's] IEP for the 2007 summer services," and

18

requesting pendency and reimbursement for tuition at Landmark School for the summer of 2007, notwithstanding that the infant plaintiff did not attend the Landmark School summer program in 2007. (Compl. No. 2, ¶¶ 4.1-4.3, ¶¶ 5.88-5.89). According to plaintiffs, on June 28, 2007, IHO Susan Lushing denied their demand for pendency, without holding a pendency hearing, on the basis of IHO Lazan's decision denying pendency for the 2006-2007 school year. (Compl. No. 2, ¶¶ 4.4-4.5, 5.90-5.91).

Plaintiffs allege that between August 22, 2007 and September 27, 2007, a four (4) day hearing was held before IHO Lushing to address plaintiffs' request for the same level of summer services as provided during the summer of 2006. (Compl. No. 2, ¶¶ 4.6, 5.97). By decision dated November 11, 2007, IHO Lushing awarded plaintiffs twenty-four (24) hours of one-to-one tutoring not to exceed two thousand four hundred dollars ($2,400.00) and indicated that had the infant plaintiff been enrolled in Landmark School during the summer of 2007, she would have awarded reimbursement for that tuition. (Compl., No. 2, ¶¶ 4.7-4.8, 5.98).

On February 8, 2008, Kelly sustained the UFSD's appeal of IHO Lushing's decision and annulled the decision. (Compl. No. 2, ¶¶ 4.9-4.10, 5.103).

### B. Procedural History

#### 1. Action No. 1

On April 1, 2008, plaintiffs commenced Action No. 1 against the UFSD defendants, Kelly and Ingerman Smith, alleging violations of, *inter alia*, the IDEA, the Rehabilitation Act, Sections 1983 and 1985, the ADA, the New York Education Law and the New York Constitution. Pursuant to Section 1983, plaintiffs allege: (1) that Thompson, White and

Dempsey denied the infant plaintiff her right to a free and appropriate public education ("FAPE") secured under the IDEA and Rehabilitation Act by "deliberately misconstru[ing] special education services awarded to [the infant plaintiff] as general education services," (first Section 1983 cause of action) (Compl. No. 1, ¶¶ 6.4-6.5); (2) that the BOE defendants and Gallagher denied the infant plaintiff her right to a FAPE by refusing to enact a "policy on providing AIS services to their students," as required by the New York State Education Law, (Compl. No. 1, ¶ 6.7) (second Section 1983 cause of action); (3) that Gallagher denied the infant plaintiff her right to a FAPE by "misusing his authority" to recommend that the BOE defendants approve the infant plaintiff's "special education services as AIS services in addition to the hiring of outside providers for [the infant plaintiff's] so called [sic] 'AIS' services," (third Section 1983 cause of action) (Compl. No. 1, ¶ 6.9); (4) that by his September 5, 2007 decision, IHO Lazan denied the infant plaintiff her right to a FAPE by "us[ing] the authority granted him as an administrative law judge to overrule [his January 17, 2007 decision that the services provided to the infant plaintiff as AIS services were in fact special education services]," (fourth Section 1983 cause of action) (Compl. No. 1, ¶¶ 6.11-6.14); and (5) that Kelly denied the infant plaintiff her right to a FAPE by "us[ing] his authority as state review officer" to (a) impliedly overturn IHO Lazan's January 17, 2007 unappealed decision, since the "only way [his] decision could stand on appeal is if [the infant plaintiff's] special education services were deemed general education services," (b) "refuse[] to consider new educational testing approved and paid for by [the UFSD] which was [sic], as it directly contradicted his decision that [the infant plaintiff] had not been denied FAPE by the defendants * * * [then] admit the same testing in a subsequent appeal when he believed it justified the overturning of [IHO Lazan's] decision favoring the parent," and (c) go "beyond the

basis of the scope of IHO Lazan's decision," (fifth and sixth Section 1983 causes of action) (Compl. No. 1, ¶¶ 6.16-6.22).

Plaintiffs also allege that defendants violated Section 1985 by conspiring to deny plaintiffs a FAPE by "forgery, perjury, fraud, and ex-parte communication." (Compl. No. 1, ¶ 7.5). Specifically, plaintiffs allege: (1) that Mellas, Dempsey, Riddell and Cariello "collaborated to write a document which was found by the parents in a pre hearing review of [the infant plaintiff's] records" and that "[a]fter 21 hours of witness prep time by defendant's [sic] counsel * * * [those defendants] all provided identical testimony at the hearing stating that they didn't know how the [sic] it was that the date on the document showed it was written prior to a parent conference meeting rather [sic] after the meeting as they all claimed," which "led the IHO to believe that the defendants didn't notice any regression in [the infant plaintiff]," (Compl. No. 1, ¶¶ 7.11-7.12); (2) that Riddell testified during a hearing (a) that he destroyed the infant plaintiff's education records that had been given to him by Cariello, thereby avoiding the requirement that he produce samples of the infant plaintiff's work in English, and (b) that the size of his resource room was never more than one (1) or two (2) students, which contradicted the infant plaintiff's claim that there were often five (5) to eight (8) children in the resource room in violation of her IEP, (Compl. No. 1, ¶¶ 7.13-7.15); (3) that Riddell and Cariello falsely denied having received a copy of the infant plaintiff's parents' agenda distributed to all members of the CSE at the May 2006 CSE meeting, (Compl. No. 1, ¶ 7.16); (4) that White lied under oath when she denied ever presenting Geffner's report to the CSE during the March 2006 meeting and testified that she disagreed with Geffner's findings, (Compl. No. 1, ¶ 7.17); (5) that White and Riddell falsely denied ever seeing the neuropsychological report of Dr. MacAllister, (Compl. No. 1, ¶ 7.18); and

(6) that Thompson falsely testified (a) that the Landmark School placement was "a gift" to the infant plaintiff, to which some teachers were opposed, (b) that no goals or objectives were discussed, and no decision was made regarding speech services for the infant plaintiff at the May 2006 CSE meeting, (c) that the infant plaintiff was not eligible for reading and speech services or EYS, and (d) that the infant plaintiff's disabilities were not severe and that the UFSD had met, and would continue to meet, the infant plaintiff's educational needs, (Compl. No. 1, ¶¶ 7.19-7.21, 7.24-7.27).

Plaintiffs further allege: (1) that Thompson and Ingerman Smith produced as evidence during a hearing a document Thompson claimed to be CSE meeting notes, although she subsequently admitted that the infant plaintiff's parents' copy of the document "was indeed the true document," (Compl. No. 1, ¶ 7.33); and (2) that Ingerman Smith produced or created "a document claimed to be an attachment to the exhibit for this hearing," although the UFSD had previously denied the existence of the documents, (Compl. No. 1, ¶¶ 7.36-7.37) (second Section 1985 cause of action).

Plaintiffs' third cause of action pursuant to Section 1985 asserts that Ingerman Smith aided Thompson's attempt to deny the infant plaintiff a FAPE by submitting a forged document as evidence during the hearing and continuing to allow witnesses to claim that the special education services provided to the infant plaintiff were general education services. (Compl. No. 1, ¶¶ 7.42-7.44).

Plaintiffs' fourth cause of action pursuant to Section 1985 alleges that Kelly conspired "to rule against parents in tuition reimbursement cases," such as the infant plaintiff's case. (Compl. No. 1, ¶¶ 7.46-7.56).

In addition, plaintiffs allege (1) that defendants violated the IDEA by, *inter alia*: (a) failing to properly evaluate the infant plaintiff or to develop an appropriate IEP; (b) denying to fund the private school educational services the infant plaintiff needed at Landmark School; and (c) failing to hold an impartial hearing to resolve plaintiffs' disputes, (Compl. No. 1, ¶¶ 8.7-8.16); and (2) that defendants violated the Rehabilitation Act by, *inter alia*: (a) intentionally discriminating against the infant plaintiff "solely on the basis of her disability," and (b) harassing, intimidating and retaliating against plaintiffs for their advocacy of the infant plaintiff's rights. (Compl. No. 1, ¶ 8.16).

Plaintiffs seek (1) judgment declaring (a) that the UFSD denied the infant plaintiff a FAPE, (b) that the infant plaintiff "is entitled to educational services to compensate for her loss of educational opportunity caused by the [UFSD's] failure to provide her appropriate programming and services from September 2006-June 2007," and (c) that the infant plaintiff "has derived meaningful educational benefit from the special education services she has received at Landmark School;" (2) reimbursement "for all costs of [the infant plaintiff's] placement at Landmark School, * * * until such time until her placement can be appropriately changed or she is not [sic] longer entitled to services under IDEA;" and (3) costs and attorney's fees on this action and the administrative proceedings pursuant to 20 U.S.C. § 1415(i)(3)(B). (Compl. No. 1, pp. 49-50).

### 2. Action No. 2

On May 8, 2008, plaintiff commenced Action No. 2, individually and on behalf of the infant plaintiff, against the second defendants. On September 4, 2008, plaintiffs filed an amended

23

complaint against the second defendants alleging violations of, *inter alia*, the IDEA, the Rehabilitation Act, Sections 1983 and 1988, the ADA, the New York Education Law and the New York Constitution.

Plaintiffs' first cause of action pursuant to Section 1983 is the same as her first Section 1983 cause of action in Action No. 1, i.e., that the infant plaintiff was denied her right to a FAPE by the conduct of certain defendants "deliberately misconstru[ing] special education services awarded to [the infant plaintiff] as general education services," with the exception that in addition to Thompson, White and Dempsey, plaintiffs also assert this cause of action against Butta, Cahill, Mellas and Riddell. (Compl. No. 2, ¶¶ 6.4-6.5). Plaintiffs' second, third, fifth and sixth causes of action pursuant to Section 1983 alleged in Action No. 2 are virtually identical to those in Action No. 1. (Compl. No. 2, ¶¶ 6.7, 6.9, 6.14-6.20). Plaintiffs' fourth cause of action pursuant to Section 1983 alleges that the UFSD's attempt "to strip [the infant plaintiff] of her right to special education services by disguising them * * * [as] AIS Services, is illegal." (Compl. No. 2, ¶ 6.12).

Plaintiffs' causes of action pursuant to Section 1985 alleged in Action No. 2 are essentially identical to those in Action No. 1. (Compl. No. 2, ¶¶ 7.11- 7.55). The cause of action in Action No. 2 alleging that defendants violated the IDEA is the same as that cause of action in Action No. 1, except insofar as plaintiffs additionally allege (1) that the November 11, 2007 decision by IHO Lushing, indicating that the infant plaintiff's parents would have been entitled to reimbursement at Landmark School, denied plaintiffs their right to a FAPE because the parents did not have the means to fund summer services at Landmark School, (Compl. No. 2, ¶¶ 8.11-812); and (2) that Kelly's January 2008 decision "went beyond the scope of the due process

24

complaint, refused to include the testing of the [UFSD's] Neuropsychologist * * * and contains substantial errors of law and fact," (Compl. No. 2, ¶¶ 6.7, 6.9, 6.14-6.20).(Compl. No. 2, ¶¶8.13-8.14). Although plaintiffs conclusorily allege that defendants violated the Rehabilitation Act in Action No. 2, (Compl. No. 2, ¶ 1.1), they do not otherwise state a claim for relief under that statute. (Compare Compl. No. 1, ¶ 8.16).

The relief sought in Action No. 2 is similar to the relief sought in Action No. 1, except that plaintiffs seek (1) a declaration, *inter alia*, that the infant plaintiff "is entitled to educational services to compensate for her loss of educational opportunity caused by the [UFSD's] failure to provide her appropriate programming and services from June 25, 2007-August 30, 2007," (as opposed to September 2006-June 2007); and (2) reimbursement "for all costs of [the infant plaintiff's] lost [sic] of Educational services, educational opportunity and documented regression," (as opposed to just the costs associated with her placement at Landmark School), (Compl. No. 2, pp. 46-47).

### 3. Pending Motions

Kelly now moves pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure to dismiss the complaint against him for lack of jurisdiction and failure to state a claim. Ingerman Smith moves pursuant to Rule 42(a) of the Federal Rules of Civil Procedure to consolidate the two actions and pursuant to Rules 12(b) and (c) of the Federal Rules of Civil Procedure to dismiss the complaint as against it. Plaintiffs have not opposed either motion.

## II. Discussion

A.    Consolidation

Rule 42(a) of the Federal Rules of Civil Procedure provides that "[i]f actions before the court involve a common question of law or fact, the court may: * * * consolidate the actions; or issue any other orders to avoid unnecessary cost or delay." The district court has broad discretion to determine whether consolidation is appropriate. Johnson v. Celotex Corp., 899 F.2d 1281, 1284-1285 (2d Cir. 1990). Although considerations of judicial economy generally favor consolidation, "[c]onsiderations of convenience and economy must yield to a paramount concern for a fair and impartial trial." Id. at 1285. In determining whether consolidation is appropriate, the court must consider:

> Whether the specific risks of prejudice and possible confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

Id. (internal quotations and citations omitted).

The complaints in both actions, *inter alia*, relate to the infant plaintiff's IEP and request similar relief. Action No. 1 relates to the 2005-2006 and 2006-2007 school year, whereas Action No. 2 relates to the summer of 2007. Accordingly, the two actions involve common questions of law and fact and, thus, are consolidated for all purposes, including trial. The actions will proceed under docket number CV-08-1319 (the "lead case"), all papers filed in these actions shall henceforth bear only the lead case docket number, and the caption of this action shall be amended accordingly.

26

B.    Standing

Plaintiffs are proceeding *pro se*. However, generally, parents "cannot represent their children's IDEA claims *pro se*." L.A. v. Granby Board of Education., Nos. 05-4168-cv, 05-6315-cv, 227 Fed. Appx. 47, * 49, 2007 WL 1475570 (2d Cir. May 15, 2007) (citing Tindall v. Poultney High School Dist., 414 F.3d 281, 285 (2d Cir. 2005)). Therefore, to the extent the complaints assert claims on behalf of the infant plaintiff, who cannot appear *pro se*, see Fed. R. Civ. P. 17, or be represented by her non-attorney parent, see Machadio v. Apfel, 276 F.3d 103, 106 (2d Cir. 2002), plaintiff is directed to obtain counsel for the infant plaintiff or to move for the appointment of counsel for the infant plaintiff **within thirty (30) days** from the date this Order is served with notice of entry upon plaintiffs, or the claims asserted on the infant plaintiff's behalf will be dismissed without prejudice. See, e.g. Wenger v. Canastota Central School Dist. 146 F.3d 123, 125 (2d Cir. 1998), overruled on other grounds by, Winkelman ex rel. Winkelman v. Parma City School Dist., 550 U.S. 533, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007).

However, the IDEA grants parents "independent, enforceable rights * ** which are not limited to certain procedural and reimbursement-related matters, [and] encompass the entitlement to a free and appropriate public education for the parents' child." Winkelman, 550 U.S. at 533, 127 S.Ct. 1994. Accordingly, plaintiff may proceed *pro se* on her claims that her "*own* rights as a parent under the IDEA were violated," L.A., 227 Fed. Appx. at * 49, 2007 WL 1475570, including, *inter alia*, her claims challenging the procedures followed by defendants, her reimbursement claim, and her claims relating to "the substantive adequacy of the education provided to [the infant plaintiff] * * * [and] [t]he right to a free appropriate public education for [the infant plaintiff]." See Winkelman, 550 U.S. at 531-532, 127 S.Ct. 1994.

27

In addition, plaintiff may assert discrimination and retaliation claims under the Rehabilitation Act and ADA, since "a parent of a child with a disability has a particular and personal interest" in preventing discrimination against that child. <u>Winkelman</u>, 550 U.S. 516, 127 S.Ct. at 2003; <u>see</u> <u>Blanchard v. Morton School Dist.</u>, 509 F.3d 934, 938 (9th Cir. 2007) (holding that the mother, insofar as she was asserting and enforcing the rights of her son and incurring expenses for his benefit, had standing to bring ADA and Rehabilitation Act claims); <u>Weber v. Cranston School Committee</u>, 212 F.3d 41, 48-49 (1st Cir. 2000) (holding that the mother had standing to assert a claim under the Rehabilitation Act that defendants retaliated against her for her complaints relating to her child's education); <u>see also</u> <u>Kampmeier v. Nyquist</u>, 553 F.2d 296, 299 (2d Cir. 1977) (holding that disabled students, along with their parents, had standing to bring suit against school officials under the Rehabilitation Act).

## C. Standard of Review on Motions to Dismiss

### 1. Rule 12(b)(1)

As plaintiff is proceeding *pro se*, her submissions "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." <u>Erickson v. Pardus</u>, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); <u>see also</u> <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d 185, 191 (2d Cir. 2008). Nevertheless, *pro se* plaintiffs are not excused from the normal rules of pleading and dismissal. Where subject matter jurisdiction is lacking, "dismissal is mandatory." <u>Manway Const. Co., Inc. v. Housing Authority of City of Hartford</u>, 711 F.2d 501, 503 (2d Cir. 1983).

"In determining whether the federal courts have subject matter jurisdiction over a cause

of action, a district court must look to the way the complaint is drawn to see if it claims a right to recover under the laws of the United States." IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1055 (2d Cir.1993) (quoting Goldman v. Gallant Securities, Inc., 878 F.2d 71, 73 [2d Cir.1989]). In considering a motion to dismiss for lack of subject matter jurisdiction, a court must accept as true all material factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. Morrison v. National Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), cert. filed, ___ S.Ct. ___, 2009 WL 789199 (June 1, 2009). However, when deciding a jurisdictional motion, district courts may look beyond the allegations of the complaint and "examine evidence outside of the pleadings." Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008). Plaintiffs have the burden of establishing by a preponderance of the evidence that subject matter jurisdiction exists. Arar, 532 F.3d at 168 (citing APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003).

    2.      Rule 12(b)(6)

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); see also Boykin v. KeyCorp, 521 F.3d 202, 214 (2d Cir. 2008). "A pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S.Ct. at 1959. The plausibility standard requires "more than a sheer possibility that defendant has acted unlawfully." Iqbal, ___ U.S. ___, 129 S.Ct. at 1949.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008), cert. denied, 128 S.Ct. 2964, 171 L.Ed.2d 906 (2008) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, ___ U.S. ___, 129 S.Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950.

In determining a motion to dismiss, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers, 282 F.3d at 152-153.

3. Rule 12(c)

In deciding a Rule 12(c) motion, the same plausibility standard as applicable to a motion to dismiss under Rule 12(b)(6) is employed. Johnson v. Rowley, ___ F.3d ___, 2009 WL 1619401, at * 2 (2d Cir. June 11, 2009).

D. Ingerman Smith's Motion

1. Section 1983 Claims

Ingerman Smith contends, *inter alia*, that since it is not mentioned in any of plaintiff's Section 1983 causes of action, those claims must be dismissed as against it.

To state a claim under Section 1983, a complaint must contain factual allegations plausibly suggesting (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 122 (2d Cir. 2004)(internal quotations and citation omitted); see Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997) (affirming the dismissal of the plaintiff's Section 1983 claim against defendant Coughlin on the basis that the plaintiff failed to allege his personal involvement in any alleged constitutional deprivation). A complaint based on a violation under Section 1983 that does not allege the personal involvement of a defendant is

31

"fatally defective on its face." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987) (internal quotations and citations omitted); see also Rosa R. v. Connelly, 889 F.2d 435, 437 (2d Cir. 1989).

Since plaintiff does not plead any factual allegations plausibly suggesting that Ingerman Smith was personally involved in any of the alleged constitutional violations on which the Section 1983 claims are based, the amended complaints fail to state a Section 1983 cause of action against Ingerman Smith. Accordingly, plaintiff's Section 1983 claims against Ingerman Smith are dismissed without prejudice.

### a.    Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires." When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Thompson v. Carter, 284 F.3d 411, 419 (2d Cir. 2002) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir.1991)). Nevertheless, "[l]eave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of

32

relief, he ought to be afforded an opportunity to test his claim on the merits." <u>Foman</u>, 371 U.S. at 182. However, if amendment would be futile, i.e., if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6), leave to amend may be denied. <u>See</u> <u>Lucente v. International Business Machines Corp.</u>, 310 F.3d 243, 258 (2d Cir. 2002).

Contrary to Ingerman Smith's contention, it is not absolutely immune from suit. All of the cases cited by Ingerman Smith in support of its prosecutorial immunity defense involve attorneys directly employed by a governmental or public entity. <u>See, e.g.</u> <u>Butz v. Economou</u>, 438 U.S. 478, 516, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (hearing examiner for the Agriculture Department, a federal agency); <u>Verbeek v. Teller</u>, 158 F.Supp.2d 267 (E.D.N.Y. 2001) (village attorney); <u>Zbryski v. Board of Trustees of New York Fire Dept. Pension Fund</u>, No. 01-Civ.-4801, 2004 WL 2238503, at * 6 (S.D.N.Y. Oct. 4, 2004) (corporation counsel); <u>Spear v. Town of West Hartford</u>, 954 F.2d 63 (2d Cir. 1992) (corporation counsel); <u>Rudow v. City of New York</u>, 822 F.2d 324 (2d Cir. 1987) (staff attorney of Human Rights Commission); <u>Delgado v. Chan</u>, 97-Civ. 2251, 1997 WL 527876 (S.D.N.Y. Aug. 22, 1997) (prosecutor). Ingerman Smith is a private law firm retained by the UFSD. (<u>See</u> Memorandum of Law in Support of Defendant, Ingerman Smith LLP's Motion to Consolidate and Dismiss [IS Mem.], p. 13 "Ingerman Smith was retained to defend the [UFSD] in the [administrative] hearings * * *.").

Nor would Ingerman Smith be immune from suit under the doctrine of qualified immunity. Although Ingerman Smith represented the UFSD during the administrative proceedings, it is not a governmental or public entity; it was not performing a unique governmental function or undertaking any actions that otherwise would be performed by government employees; and its performance was not closely supervised or specifically directed

by the government. Rather, Ingerman Smith is a private law firm that was retained by the UFSD, presumably for profit pursuant to a retainer agreement, and is, therefore, subject to competitive market pressures to which public entities are not. Thus, the policies underlying the qualified immunity defense are not implicated.[3] See, e.g. Richardson v. McKnight, 521 U.S. 399, 404-412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (refusing to extend the defense of qualified immunity to a private prison guard, notwithstanding that prison guards directly employed by the government may have enjoyed such immunity from suit); Toussie v. Powell, 323 F.3d 178,183 (2d Cir. 2003) (holding that private defendants are not entitled to defense of qualified immunity with respect to Section 1983 claims); Bender v. General Services Admin., 539 F.Supp.2d 702, 714 (S.D.N.Y. 2008) (citing circuit courts cases rejecting the extension of the qualified immunity defense to private parties operating under contract for the government); Venable v. Keever, 61 F.Supp.2d 552, 561-562 (N.D. Tex. 1999) (refusing to extend the defense of qualified immunity to attorney defendants who were employed as independent contractors to work for the school district). "If [Ingerman Smith] [is] granted qualified immunity, it would apply and be available to virtually every independent contractor or agent who works on behalf of the government, and that is not the purpose of qualified immunity." Venable, 61 F.Supp.2d at 562.

Since Ingerman Smith is not immune from suit and it does not appear, upon a liberal reading of the amended complaints, that a Section 1983 conspiracy claim against Ingerman Smith

---

[3] The purpose of the qualified immunity doctrine is to protect "'government's ability to perform its traditional functions' by providing immunity where 'necessary to preserve' the ability of government officials 'to serve the public good or to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" Richardson, 521 U.S. at 407-408, 117 S.Ct. 2100 (quoting Wyatt v. Cole, 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992)).

would be futile, plaintiff is granted leave to amend her consolidated amended complaints to assert a valid Section 1983 conspiracy claim against Ingerman Smith **within thirty (30) days** from the date notice of entry of this Order is served upon her. Failure of plaintiff to timely amend her amended complaints, as consolidated, will result in dismissal of the Section 1983 claims asserted on her own behalf against Ingerman Smith with prejudice.

E.     Kelly's Motion

1.     Immunity

Kelly contends that all claims against him are barred by the doctrine of judicial immunity.

Under the doctrine of absolute judicial immunity, judges are subject to suit seeking retroactive relief only for: (1) "non-judicial actions, i.e., actions not taken in the judge's judicial capacity;" or (2) "actions, though judicial in nature, taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11-12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991) (internal citations omitted); see Stump v. Sparkman, 435 U.S. 349, 356, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). This absolute "judicial immunity is not overcome by allegations of bad faith or malice," nor can a judge "be deprived of immunity because the action he took was in error ... or was in excess of his authority." Mireles, 502 U.S. at 11, 112 S.Ct. 286 (quoting Stump, 435 U.S. at 356, 98 S. Ct. 1099).

The doctrine of absolute immunity has been extended "to certain others who perform functions closely associated with the judicial process," Cleavinger v. Saxner, 474 U.S. 193, 200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), such as administrative officials exercising independent

35

quasi-judicial powers. See Montero v. Travis, 171 F.3d 757, 760 (2d Cir. 1999); see also

DeMerchant v. Springfield School Dist., No. 1:05 CV 316, 2007 WL 495240, at * 3 (D. Vt. Feb.

9, 2007) (citing cases holding that state hearing officers were entitled to absolute judicial

immunity). Absolute immunity stems from "the nature of the responsibilities of the individual

officer." Cleavinger, 474 U.S. at 201, 106 S.Ct. 496. "There can be little doubt that the role of

the modern federal hearing examiner * * * is 'functionally comparable' to that of a judge." Butz,

438 U.S. at 513, 98 S.Ct. 2894. Similarly, the role of a state review officer, whose function is to

review administrative appeals from decisions of impartial hearing officers and render an

"independent decision," see 20 U.S.C. § 1415(g); N.Y. Education Law § 4404(2), is likewise

"functionally comparable" to that of a judge. Thus, absolute immunity shields state review

officers to the same extent it has been found to shield hearing officers and administrative law

judges.

All of plaintiff's claims against Kelly relate to the alleged misuse of his authority as a

state review officer in rendering decisions in plaintiffs' administrative proceedings, (Compl. No.

1, ¶¶ 6.16-6.22; Compl. No. 2, ¶¶ 6.14-6.20, 8.13-8.14), and to his rulings in tuition

reimbursement cases in general. (Compl. No. 1, ¶¶ 7.46-7.56; Compl. No. 2, ¶¶ 7.45- 7.55).

Plaintiff does not allege that Kelly acted outside of his role as a state review officer or that he

was acting without jurisdiction. Since all of plaintiff's claims against Kelly arise from his

conduct as an adjudicator, he is "wholly insulated" by the doctrine of absolute immunity from

plaintiff's claims seeking retroactive relief, i.e. monetary damages.[4]  Independent School Dist.

---

[4]  To the extent plaintiff seeks injunctive relief, such relief is not available as against
Kelly under the Federal Courts Improvement Act of 1996, which amended Section 1983 to limit

No. 283, St. Louis Park, Minn. v. S.D., by and through J.D., 948 F.Supp. 860, 877 n. 28 (D. Minn. 1995), aff'd, 88 F.3d 556 (8th Cir. 1996); see also DeMerchant, 2007 WL 495240, at * 4 (dismissing the plaintiffs' claims against the hearing officer on the grounds that the hearing officer was entitled to absolute immunity since his role in the denial of special education services to the plaintiffs' child was quasi-judicial in nature and the plaintiffs' claims against him pertained to actions taken solely in his role as a hearing officer); Moubry v. Kreb, 58 F.Supp.2d 1041, 1050 (D. Minn. 1999) (holding that the hearing officers were entitled to absolute immunity). Accordingly, all of plaintiff's claims against Kelly, with the exception of her claims for declaratory relief relating to continuing violations of federal law, are dismissed with prejudice as barred by the doctrine of absolute immunity.[5]

Moreover, plaintiff's claims for judgment declaring that Kelly's past conduct violated federal law are retroactive in nature and, thus, are barred by the doctrine of absolute immunity. See, e.g. Boyland v. Wing, 487 F.Supp.2d 161, 180 (E.D.N.Y. 2007) (holding that absent a continuing violation of federal law, claims for injunctive, compensatory or declaratory relief against state officials are barred by the Eleventh Amendment); Rothenberg v. Stone, 234 F.Supp.2d 217, 221-222 (E.D.N.Y. 2002) (dismissing the plaintiff's Section 1983 claims on the

---

injunctive relief against a judicial actor to situations in which a declaratory decree was violated or where declaratory relief is unavailable. See Huminski v. Corsones, 396 F.3d 53, 74 (2d Cir. 2005); Montero v. Travis, 171 F.3d 757, 761 (2d Cir. 1999). Since plaintiff does not allege that Kelly violated a declaratory decree, and prospective declaratory relief is available, any claim for injunctive relief against Kelly is dismissed with prejudice. Moreover, absent any claim that Kelly acted in excess of his jurisdiction, plaintiff cannot state a Section 1988 claim against him. 42 U.S.C. § 1988(b). Accordingly, plaintiff's Section 1988 claim against Kelly is also dismissed.

[5] In light of this determination, it is unnecessary to consider Kelly's claims that plaintiff's official capacity claims seeking retroactive relief are also barred by the Eleventh Amendment.

basis, *inter alia*, that the plaintiff sought only retrospective declaratory relief, i.e. that the defendant's past conduct violated federal law).[6]

However, the doctrine of absolute immunity does not extend to claims for declaratory relief based upon continuing violations of federal law.[7] See Supreme Court of Virginia v. Consumers Union of U.S., Inc., 446 U.S. 719, 736-737, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); Collins v. Lippman, No. 04-CV-3215, 2005 WL 1367295, at * 3 (E.D.N.Y. June 8, 2005). Accordingly, plaintiff is granted leave to amend her consolidated amended complaints to assert a claim that Kelly is committing ongoing violations of, *inter alia*, the IDEA **within thirty (30) days** from the date notice of entry of this Order is served upon her. Failure of plaintiff to timely amend her amended complaints, as consolidated, will result in dismissal of all of her claims against Kelly with prejudice.

    F.      Contentions on Both Motions

        2.      Section 1985 Claims

Ingerman Smith contends that since plaintiff has not alleged racial or other class-based discrimination, the amended complaints fail to state a Section 1985 cause of action. Kelly

---

[6] Although these cases involve the doctrine of sovereign immunity under the Eleventh Amendment, since both immunity doctrines bar only claims for retroactive relief, not claims for prospective injunctive and declaratory relief, see Green v. Mansour, 474 U.S. 64, 65-66, 73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), they are applicable here.

[7] Similarly, plaintiffs' claims for a declaratory judgment relating to ongoing conduct would likewise not be barred by the Eleventh Amendment. See Rothenberg, 234 F.Supp.2d at 221; see also Green, 474 U.S. at 65-66, 73, 106 S.Ct. 423.

contends, *inter alia*, that Section 1985 cannot be used to enforce the IDEA, which has its own procedural mechanisms for enforcement.

The elements of a claim under § 1985(3), the only possibly relevant provision here, are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States." Brown v. City of Oneonta, New York, 221 F.3d 329, 341 (2d Cir. 2000). In order to state a claim under Section 1985, a plaintiff must allege "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." See Palmieri v. Lynch, 392 F.3d 73, 86 (2d Cir. 2004) (citing Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999)); see also Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007) (accord).

Since plaintiff's complaint fails to plead factual allegations plausibly suggesting that a class-based animus existed, i.e., that any of defendants' purported conduct were committed with discriminatory intent, the amended complaints fail to state a claim under Section 1985. See, Palmieri, 392 F.3d at 86-87.[8] Accordingly, the branches of Ingerman Smith's and Kelly's

---

[8] Contrary to Ingerman Smith's contention that "the handicapped" have not been found to be a class protected by Section 1985, which it supports only with a district court case from the District of South Dakota, (IS Mem., p. 17), the Second Circuit has recognized mental disability as a class protected by Section 1985, People by Abrams v. 11 Cornwll Co., 695 F.2d 34, 42-43, vacated on other grounds, 718 F.2d 22 (2d Cir. 1983), and, thus, it logically follows that persons with other types of disabilities, i.e., learning and developmental disabilities, would also be part of a class protected by Section 1985. See, e.g. Fitzpatrick v. Town of Falmouth, 321 F.Supp.2d 119, 124 (D. Me. 2004) (recognizing the disagreement among Circuit courts as to whether Section 1985 covers disability discrimination, but following the Second and Eighth Circuits finding that it does). Although it is unsettled whether parents of a disabled child would likewise be considered members of a class protected by Section 1985, it is unnecessary to decide that issue at this stage, since, as pled, plaintiff's Section 1985 claims fail to state a cause of action.

motions seeking dismissal of plaintiff's Section 1985 claims against them are granted and those claims are dismissed without prejudice.[9] For the same reasons, plaintiff's Section 1985 claims against the remaining defendants are *sua sponte* dismissed without prejudice. Plaintiff may amend the consolidated amended complaints to assert a valid Section 1985 claim on her own behalf **within thirty (30) days** from the date notice of entry of this Order is served upon her. Failure of plaintiff to timely amend the amended complaints, as consolidated, will result in dismissal of the Section 1985 claims asserted on her own behalf in their entirety with prejudice.

3.    Claims under the ADA and Rehabilitation Act

Plaintiffs' allegations with respect to the Rehabilitation Act, i.e., that defendants intentionally discriminated against the infant plaintiff on the basis of her disability and harassed intimidated and retaliated against plaintiffs for their advocacy of the infant plaintiff's rights,

---

[9]  Contrary to the contention of Kelly, unlike the enforcement and conciliation mechanisms provided by Title VII or the ADEA, the remedial scheme of the IDEA is not so comprehensive as to preclude basing a claim for its violation under the civil rights statutes, such as Section 1985(3). Compare M.H. v. Bristol Board of Educ., 169 F.Supp.2d 21, 28 (D. Conn. 2001) (holding that the IDEA may serve as the basis for a Section 1983 cause of action since "the remedial scheme of the IDEA is not 'so comprehensive that there is an implication that it provides the exclusive remedy foreclosing all other remedies." (citing Mrs. W. v. Tirozzi, 832 F.2d 748, 755 (2d Cir. 1987))) and Polera v. Board of Educ. of Newburgh Enlarged City School Dist., 288 F.3d 478, 483 n. 5 (2d Cir. 2002) (recognizing that damages were available on claims brought under Section 1983 for violations of the EHA, the predecessor statute to the IDEA, and that district courts in this Circuit have similarly held that damages were available on Section 1983 claims for violations of the IDEA), with Sherlock v. Montefiore Medical Center, 84 F.3d 522, 527 (2d Cir. 1996) (holding that in light of the enforcement and conciliation mechanism provided under Title VII and the ADA, violations of those statutes cannot be the basis for a claim under Section 1985(3)); Paterson v. County of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) (holding that a Section 1983 action may not be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII).

(Compl. No. 1, ¶ 8.16), are only asserted in Action No. 1. Although plaintiffs conclusorily refer to the Rehabilitation Act in Action No. 2, they fail to assert any specific cause of action under that statute in Action No. 2. Similarly, plaintiffs conclusorily refer to the ADA in both actions, but fail to assert any specific cause of action under that statute in either complaint. Accordingly, plaintiff's ADA claims, as well as her claims under the Rehabilitation Act in Action No. 2, are dismissed in their entirety.

Ingerman Smith and Kelly correctly contend that individual defendants may not be sued in their individual or personal capacity under the ADA and Rehabilitation Act. See Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003); Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001). Accordingly, the branches of Ingerman Smith's and Kelly's motions seeking dismissal of plaintiff's ADA and Rehabilitation Act claims, insofar as asserted against them in their individual capacity, are granted and those claims are dismissed with prejudice. For the same reasons, plaintiff's ADA and Rehabilitation Act claims against the remaining individual defendants, insofar as asserted in their individual capacities, are likewise *sua sponte* dismissed with prejudice.

Moreover, because the UFSD and/or the NYSED are the real parties in interest with respect to plaintiff's official capacity claims under the ADA, Rehabilitation Act and IDEA, see generally Kentucky v. Graham, 473 U.S. 159, 165-166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the official capacity claims against the individual defendants are *sua sponte* dismissed with prejudice as redundant to the claims against the UFSD and/or NYSED. See, e.g. Fox v. State University of New York, 497 F.Supp.2d 446, 451 (E.D.N.Y. 2007) (citing cases dismissing official capacity claims under the ADA as redundant to claims against the state entity since the

41

plaintiff already had a cause of action against the state); S.W. by J.W. v. Warren, 528 F.Supp.2d 282, 298 (S.D.N.Y. 2007) (dismissing the plaintiff's IDEA claims against the individual defendant on the basis that there was no justification for such claims in light of the IDEA's abrogation of Eleventh Amendment immunity to the State); Artis v. Francis Howell North Ban Booster Ass'n, Inc., 161 F.3d 1178, 1182 (8th Cir. 1998) (dismissing official capacity claim as redundant to claim against school district).

Plaintiff may amend the consolidated amended complaints to assert valid claims under the ADA and/or Rehabilitation Act on her own behalf against the UFSD and NYSED **within thirty (30) days** from the date notice of entry of this Order is served upon her. Failure of plaintiff to timely amend the amended complaints, as consolidated, will result in dismissal of those claims asserted on her own behalf with prejudice.

4.      Claims under New York Education Law § 4401 and the New York State Constitution

Likewise, plaintiffs conclusorily refer to New York Education Law § 4401 and the New York State Constitution in the first paragraph of the amended complaints, but fail to otherwise assert causes of action under those provisions. Accordingly, plaintiff's state law claims are dismissed without prejudice. Plaintiff may amend the consolidated amended complaints to assert valid claims under the New York Education Law § 4401 and the New York State Constitution on her own behalf **within thirty (30) days** from the date notice of entry of this Order is served upon her. Failure of plaintiff to timely amend the amended complaints, as consolidated, will result in dismissal of plaintiff's New York Education Law § 4401 and New York State Constitution

42

claims asserted on her own behalf with prejudice.

III.    Conclusion

For the reasons stated herein: (1) the branch of Ingerman Smith's motion to consolidate Actions No. 1 and No. 2 is granted, the actions are consolidated for all purposes, including trial, and will proceed under the lead docket number CV-08-1319, all papers filed in these actions shall henceforth bear **only the lead docket number**, the caption of this action shall be amended accordingly and the Clerk of the Court is directed to administratively close case number CV-08-1864; (2) the branches of Ingerman Smith's motion seeking dismissal of plaintiff's Section 1983, Section 1985 and state law claims are granted and those claims are dismissed as against Ingerman Smith without prejudice; (3) the branches of Ingerman Smith's and Kelly's motions seeking dismissal of plaintiff's ADA and Rehabilitation Law claims are granted and those claims are dismissed in their entirety with prejudice as against them; (4) the branch of Kelly's motion seeking dismissal of all claims against him as barred by the doctrine of absolute immunity is granted to the extent that all claims asserted by plaintiff on her own behalf against Kelly are dismissed with prejudice, with the exception that plaintiff is granted leave to amend the amended complaints, as consolidated, to assert a claim seeking a declaratory judgment based upon any ongoing violation of federal law by Kelly; (5) plaintiff's Section 1985 claims are dismissed, *sua sponte*, without prejudice as against the non-moving defendants; (6) plaintiff's ADA and Rehabilitation Act claims are *sua sponte* dismissed with prejudice as against the non-moving individual defendants; (7) plaintiff's ADA claims in both actions and Rehabilitation Act claims

43

in Action No. 2 are *sua sponte* dismissed without prejudice as against the UFSD and NYSED; and (8) plaintiff is directed to obtain counsel for the infant plaintiff, or to move for the appointment of counsel for the infant plaintiff, **within thirty (30) days** from the date this Order is served with notice of entry upon her, or the claims asserted on behalf of the infant plaintiff will be dismissed without prejudice. Any amended complaint in accordance with this Order must be filed **within thirty (30) days** from the date this Order is served with notice of entry upon plaintiff, or the claims asserted on plaintiff's own behalf and dismissed without prejudice herein will be deemed to be dismissed with prejudice. This matter is referred to Magistrate Judge William D. Wall for all pre-trial purposes. The parties are directed to contact the chambers of Magistrate Judge Wall to schedule a conference herein.

The Clerk of the Court is directed to service notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to the *pro se* plaintiffs at their last known address, <u>see</u> Fed. R. Civ. P. 5(b)(2)(C).

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: June 24, 2009
      Central Islip, N.Y.

Copies to:
Donna Dzugas-Smith, *pro se*
2745 Tuckers Lane
Southold, New York 11971

Devitt Spellman Barrett
50 Route 111
Smithtown, New York 11787
Attn:   Jeltje DeJong, Esq.

New York State Attorney General's Office
200 Old Country Road, Suite 240
Mineola, New York 11501
Attn:   Ralph Pernick, A.A.G.

Catalano, Gallardo & Petropoulos, LLP
100 Jericho Quadrangle-Suite 214
Jericho, New York 11753
Attn:   Matthew K. Flanagan, Esq.
        Ralph A. Catalano, Esq.
        Candice Brook Ratner, Esq.