UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

————————————————————————X

DONNA DZUGAS-SMITH,

                        Plaintiffs,                          CV-08-1319 (SJF)(WDW)

        -against-

                                                             **OPINION & ORDER**

SOUTHOLD UNION FREE SCHOOL DISTRICT,                         **FILED**
DR. CHRISTOPHER GALLAGHER, VIRGINIA                          IN CLERK'S OFFICE
THOMPSON, RICHARD CAGGIANO, PAULETTE                         U S DISTRICT COURT E D N Y
OFRAIS, JUDI FOUCHET, DR. ROBERT WALSH,
JEANANNE DEMPSEY, PATRICIA MELLAS,                           ★   MAY 09 2012   ★
DAVID RIDDELL, ELAINE WHITE, SCOTT DESIMONE,
SUSAN NOBILE, GAIL ANDREWS BUTTA, MARY                       **LONG ISLAND OFFICE**
FITZPATRICK, MARY LOU CAHILL and BRUCE
KOLLMAR,

                        Defendants.

————————————————————————X

FEUERSTEIN, J.

        On April 1, 2008, *pro se* plaintiff Donna Dzugas-Smith ("plaintiff") commenced an

action ("Action No. 1"), individually and on behalf of her child "B.D.S.," against defendants

Southold Union Free School District ("the UFSD"), Dr. Christopher Gallagher, Virginia

Thompson, Richard Caggiano, Paulette Ofrias, Judi Fouchet, Dr. Robert Walsh, Jeananne

Dempsey, Patricia Mellas, Lori Cariello, David Riddell, Elaine White and Scott Desimone,

(collectively, the "UFSD defendants"), State Review Officer Paul F. Kelly ("Kelly") and

Ingerman and Smith L.L.P. ("Ingerman Smith").  On June 26, 2008, plaintiff filed an amended

complaint in Action No. 1 alleging violations of, *inter alia*, the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; the Rehabilitation Act of 1973 ("the

Rehabilitation Act"), 29 U.S.C. § 792, *et seq.*; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 ("Section 1983") and 1985 ("Section 1985"); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*; New York Education Law §§ 4401, *et seq.* ("New York Education Law"); and the New York State Constitution Article XI, § 1 ("New York Constitution").

On May 8, 2008, *pro se* plaintiff commenced a separate action ("Action No. 2"), individually and on behalf of B.D.S., against all of the same defendants as named in Action No. 1, as well as against Susan Nobile, Gail Andrews Butta, Mary Fitzpatrick, Mary Lou Cahill and Bruce Kollmar (collectively, "the additional UFSD defendants") and the New York State Education Department ("NYSED"). On September 4, 2008, plaintiff filed an amended complaint in Action No. 2 alleging violations of, *inter alia*, the IDEA, the Rehabilitation Act, Section 1983, 42 U.S.C. § 1988 ("Section 1988"), the ADA, the New York Education Law and the New York Constitution.

Thereafter, Ingerman Smith and Kelly moved, *inter alia*, pursuant to Rule 12 of the Federal Rules of Civil Procedure to dismiss the amended complaints in both actions as against them. By order entered June 26, 2009, this Court, *inter alia*: (1) consolidated Actions No. 1 and 2; (2) dismissed plaintiff's Section 1983, Section 1985 and state law claims as against Ingerman Smith without prejudice and *sua sponte* dismissed plaintiff's Section 1985 claims as against all defendants without prejudice; (2) dismissed plaintiff's ADA and Rehabilitation Law claims as against Ingerman Smith, Kelly and all individual defendants with prejudice; (3) dismissed plaintiff's claims as against Kelly with prejudice, with the exception that plaintiff was granted leave to amend the pleadings to assert a claim seeking a declaratory judgment based upon any

ongoing violation of federal law by Kelly; (4) *sua sponte* dismissed plaintiff's ADA claims in both actions, and her Rehabilitation Act claims in Action No. 2, as against the UFSD and NYSED without prejudice; and (5) directed plaintiff to retain counsel, or move for the appointment of counsel, on behalf of B.D.S. within thirty (30) days or all claims asserted on behalf of B.D.S. would be dismissed without prejudice.[1]

On September 21, 2009, plaintiff, individually and on behalf of B.D.S., filed an amended complaint, which became the operative pleading in the consolidated action, against all defendants[2] and moved for the appointment of counsel on behalf of B.D.S. By order entered October 2, 2009, plaintiff's motion to appoint counsel on behalf of B.D.S. was denied with leave to renew within thirty (30) days upon submission of an appropriate financial affidavit and plaintiff was advised that her failure to timely renew the motion, to secure pro bono counsel or to retain counsel on behalf of B.D.S. would result in all claims asserted on behalf of B.D.S. in this action being dismissed without prejudice.

Kelly and the NYSED subsequently moved pursuant to Rules 12(b)(1) and (5) of the Federal Rules of Civil Procedure to dismiss the amended complaint against Kelly as barred by the doctrine of absolute immunity and against Kelly and the NYSED for improper service of process, respectively; and Ingerman Smith moved pursuant to Rules 12(b) and (c) of the Federal Rules of Civil Procedure to dismiss the amended complaint as against it and for judgment on the

---

[1] On July 22, 2009, Ingerman Smith filed a notice of appeal of the June 26, 2009 order. By mandate entered December 28, 2010, the United States Court of Appeals for the Second Circuit dismissed Ingerman Smith's appeal as not ripe for review.

[2] Although not named in the caption of the amended complaint filed in the consolidated action, the body of the amended complaint refers to Laurie Cariello as a defendant and contains factual allegations against her.

pleadings, respectively. By order dated April 26, 2011, *inter alia*: (1) the branches of Ingerman Smith's motion seeking judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure was granted and plaintiff's claims were dismissed in their entirety with prejudice as against Ingerman Smith; (2) the branch of Kelly's and the NYSED's motion seeking dismissal of plaintiff's claims against Kelly as barred by the doctrine of absolute immunity was granted and plaintiff's claims were dismissed in their entirety with prejudice as against Kelly; (3) the branch of Kelly's and the NYSED's motion seeking dismissal of the amended complaint against the NYSED pursuant to Rule 12(b)(5) for insufficient service of process was granted and the amended complaint was dismissed in its entirety without prejudice as against the NYSED; (4) plaintiff's Section 1985 claims were dismissed in their entirety with prejudice; and (5) all claims asserted on behalf of B.D.S. were dismissed in their entirety without prejudice. Accordingly, only the following claims remain in this action: (1) the Section 1983 and 1988 claims asserted by plaintiff, individually, against the UFSD defendants and additional UFSD defendants (collectively, "defendants"); (2) the IDEA, Rehabilitation Act and ADA claims asserted by plaintiff, individually, against the UFSD; and (3) Ingerman Smith's counterclaim against plaintiff. Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiff's remaining claims in their entirety.[3]

---

[3] Defendants served plaintiff with their motion for summary judgment on or about September 15, 2011, in accordance with a briefing schedule set by this Court, as amended during a July 25, 2011 status conference. When plaintiff failed to timely serve any opposition to the motion in accordance with the amended briefing schedule, i.e., by October 12, 2011, or to seek an extension of time to do so, defendants twice moved for leave to file their motion as unopposed. Plaintiff did not respond to either of those motions, filed October 24, 2011 and November 16, 2011, respectively. Accordingly, by order dated November 18, 2011, defendants were granted leave to file their summary judgment motion as unopposed. Defendants filed their unopposed motion on November 28, 2011. Only thereafter did plaintiff belatedly seek an

I.     Background

    A.     Factual Background[4]

        1.     The Parties

Plaintiff is the mother and natural guardian of B.D.S., a child with a history of

developmental and learning problems who received a public education in the UFSD through and

including the 2005-2006 academic year (her sixth grade year). (56.1 Stat., ¶ 1).

The following defendants were employed by the UFSD in the following capacities at all

relevant times: (1) Virginia Thompson ("Thompson"), as the director of special education, the

chairperson of the Committee of Special Education ("CSE") and the administrator of pupil

personnel services; (2) Dr. Christopher Gallagher ("Gallagher"), as superintendent; (3) David

Riddell ("Riddell"), as the special education teacher designated on the individualized education

program ("IEP") developed for B.D.S.; (4) Laurie Cariello ("Cariello"), as the English language

arts teacher of the sixth (6th) grade "teaching team" for B.D.S.; (5) Jeananne Dempsey, a/k/a

Jeanne Dempsey ("Dempsey"), as the science and math teacher of the sixth (6th) grade "teaching

team" for B.D.S.; (6) Patricia Mellas, a/k/a Patti Mellas ("Mellas"), as the social studies teacher

of the sixth (6th) grade "teaching team" for B.D.S.; (7) Elaine White ("White"), as the school

---

extension of time to oppose the motion, more than six (6) weeks after the deadline to serve her
opposition set forth in the amended briefing schedule had expired. In light of plaintiff's
unreasonable failure to timely oppose the motion or to seek an extension of time to do so, her
request for an extension of time to oppose the motion was denied by order dated January 26,
2012.

    [4] The facts are taken from defendants' Statement of Undisputed Facts pursuant to Rule
56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern
Districts of New York ("Local Rule 56.1"), to the extent supported by the administrative record,
as well as from the administrative record itself.

psychologist at Southold Elementary School within the UFSD; (8) Susan Nobile ("Nobile"), as a reading specialist; (9) Mary Fitzpatrick ("Fitzpatrick"), as the principal and building administrator of the Junior/Senior High School within the UFSD; (10) Gail Andrews Butta ("Butta"), as the head of special education in the Junior/Senior High School within the UFSD; and (11) Mary Lou Cahill ("Cahill"), as the special education teacher assigned to B.D.S. by the UFSD. In addition, at all relevant times, the Board of Education of the UFSD was comprised of the following defendants: Richard Caggiano ("Caggiano") as President, and Paulette Ofrias ("Ofrias"), Judi Fouchet ("Fouchet"), Dr. Robert Walsh ("Walsh") and Scott DeSimone ("DeSimone"), as members (collectively, the "BOE defendants"). Moreover, defendant Bruce Kollmar ("Kollmar") was, at all relevant times, the "Out of District CSE Chairperson" under contract with the UFSD.

### 2. B.D.S.'s Performance in Fifth Grade

An "Evaluation Review" completed by Nobile in September 2004, at the beginning of B.D.S.'s fifth grade year, indicates that B.D.S. "demonstrated average regression over the summer, meaning her levels [were] consistent with those normally demonstrated over a long vacation," and, therefore, that extended year ("EY") services[5] for B.D.S. were not warranted. In

---

[5] New York Education Law provides, in relevant part, that "[t]he board of education * * * shall be required to furnish suitable educational opportunities for children with [disabilities] by one of the special services or programs listed [in that statute]. The need of the individual child shall determine which of such services shall be rendered. Each district shall provide to the maximum extent appropriate such services in a manner which enables children with [disabilities] to participate in regular education services when appropriate. Such services or programs shall be furnished *between the months of September and June of each year*, except that * * * with respect to the students whose [disabilities] are severe enough to exhibit the need for a structured learning environment of twelve months duration *to maintain developmental levels*, the board of education

an October 2004 progress report, Nobile further indicated, *inter alia*: (1) that B.D.S. demonstrated consistent growth in sight word development skills over time; (2) that although test scores revealed a "slight regression" in B.D.S.'s decoding skills over the summer, B.D.S. was able to "retrieve[] and surpass[] her 4/01/04 level of performance, indicating consistent growth in [those] skills over time;" and (3) that B.D.S.'s word reading efficiency was within normal limits for her age. By November 2004, Nobile reported, *inter alia*, that B.D.S. no longer demonstrated any summer regression. Furthermore, in December 2004, Nobile, *inter alia*: (1) reported that B.D.S.'s sight word and decoding skills were "firmly within the average range;" and (2) recommended that the CSE discontinue the reading services previously provided by the UFSD for B.D.S. in order to allow her more time to apply her reading skills within the classroom setting.

On her final report card for the 2004–2005 academic year, B.D.S. received grades of "3," with the highest grade attainable being a "4," in all areas of the four (4) academic subjects, i.e.,

---

* * * upon the recommendation of the [CSE] * * * shall also provide * * * for the provision of special services and programs * * * during the months of July and August as contained in the [IEP] for each eligible child * * *." N.Y. Educ. Law § 4402(2)(a) and (b) (emphasis added). In addition, regulations promulgated by the New York State Commissioner of Education ("the Commissioner") provide, in relevant part, that "[s]tudents shall be considered for twelve month special services and/or programs in accordance with their need to prevent substantial regression, if they are: * * * students who * * * because of their disabilities, exhibit the need for a twelve month special service and/or program provided in a structured learning environment of up to twelve months duration *in order to prevent substantial regression* as determined by the [CSE]. * * * All [EY services] programs * * * offered during July and August shall have been approved by the commissioner [of Education] in the first year in which the program is offered and periodically thereafter." 8 N.Y.C.R.R. § 200.6(k) (emphasis added). "Substantial regression" is defined in the regulations as "a student's inability to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year." 8 N.Y.C.R.R. § 200.1(aaa).

English language arts, mathematics, science and social studies, indicating that her performance in those subjects met grade level expectations, with the exception that she received a grade of "2" in the area of reading, indicating that she displayed difficulty meeting grade level expectations in that one (1) area.

### 3. The 2005-2006 Academic Year

On May 11, 2005, the CSE met to conduct its annual review. The IEP developed for B.D.S. for the 2005-2006 academic year (her sixth grade year) included: (1) resource room services for three (3) days out of the six (6)-day cycle, individual remedial reading services for one (1) hour twice a week and individual speech therapy services for two (2) days out of the six (6)-day cycle; (2) support services, including use of a graphic organizer with Inspiration software, use of an auditory enhancer and testing accommodations; and (3) academic intervention ("AI") services[6] during the summer of 2005, including speech therapy twice a week for six (6) weeks

---

[6] Regulations promulgated by the Commissioner authorize school districts to provide AI services to students within their district who score below the state designated performance level on state elementary assessments in English language arts, mathematics, science and/or social studies or who "are determined, through a district-developed or district adopted procedure * * * to be at risk of not achieving State standards in English language arts, mathematics, social studies and/or science. See 8 N.Y.C.R.R. § 100.2(ee) (2). School districts are responsible for "develop[ing] a description of [AI] instructional and/or student support services to be provided in schools to students in need of such services * * *." 8 N.Y.C.R.R. § 100.2(ee)(4)(1)(i). The description of available AI services "shall specifically describe: (a) the district-wide procedure(s) used to determine the need for [AI] services; (b) [AI] instructional and/or student support services to be provided pursuant to paragraph (5) of this subdivision; (c) whether instructional services and/or student support services are offered during the regular school day or during an extended school day or year; and (d) the criteria for ending services, * * *." Id. School districts may: (i) "use time available for [AI] instructional and/or student support services during the regular school day[,] [and] (ii) * * * provide students with extended academic time beyond the regular school day and school year." 8 N.Y.C.R.R. § 100.2(ee)(5).

and one-to-one reading services twice a week for eight (8) weeks. (56.1 Stat, ¶¶ 6-7). B.D.S.'s parents agreed with the CSE's recommendations for the 2005-2006 academic year and for the summer of 2005 and B.D.S. received the AI services during the summer 2005 in accordance with the IEP.

In October 2005, near the beginning of B.D.S.'s sixth grade year, Deborah Kinahan ("Kinahan"), B.D.S.'s reading teacher, conducted an educational evaluation of B.D.S. and reported, *inter alia*, that B.D.S.'s developmental level on basic reading skills and reading comprehension was within the average range of scores obtained by others at her grade level.

In November 2005, White conducted a cognitive and educational evaluation of B.D.S. and reported, *inter alia*: (1) that B.D.S.'s working memory capacity was limited, but within the low average range; (2) that B.D.S.'s academic achievement in broad written language and written expression was within the average range and her overall reading ability was limited; (3) that B.D.S.'s fluency (a) in mathematics problems and writing was average and (b) with reading tasks was limited; (4) that B.D.S.'s nonverbal reasoning abilities were within the high average range and were much better developed that her verbal reasoning abilities, which were within the average range; (5) that B.D.S.'s abilities to sustain attention, concentrate and exert mental control were in the low average range and were a weakness relative to her nonverbal and verbal reasoning abilities; and (6) that B.D.S.'s ability to process simple or routine visual material without making errors was in the average range.

In December 2005, an independent auditory and language processing re-evaluation of B.D.S. was conducted by Donna Geffner ("Geffner"), who reported, *inter alia*: (1) that B.D.S. had a borderline deficit in auditory processing, with difficulties in reading accuracy,

comprehension, short-term memory, distractability, figure-ground listening, receptive and

expressive language and attentional issues, similar to those presented during Geffner's initial

evaluation of B.D.S. in September 2004; (2) that B.D.S.'s test scores had improved in the areas

of (a) phonemic synthesis, which was above the criterion for her age, and (b) auditory

conceptualization, which continued to be below the criterion for her grade level, but only by one

(1) year as opposed to her previous test score which was below the criterion in that area by two

(2) grade levels; (3) that B.D.S.'s temporal integration was not completely developed, her

working memory was impaired and her short-term memory, word retrieval ability, auditory

comprehension and receptive language skills remained compromised; (4) that B.D.S. displayed

difficulty in the area of rapid naming; (5) that there was (a) "a significant improvement" in

B.D.S.'s expressive language, which was within the average range upon reevaluation, (b) "a

small improvement" in B.D.S.'s receptive language, (c) improvement in B.D.S.'s core language,

language content, Word Classes, semantic relationships and all expressive language tasks, i.e.,

word definitions, formulated sentences and sentence assembly, (d) "a slight decrease" in B.D.S.'s

language memory, which was still within the low average range, and (e) no improvement in

B.D.S.'s ability to understand concepts and spoken paragraphs and to follow directions; (6) that

B.D.S. had made progress and improvement through accommodations, "appropriate

intervention" and reading instruction, but continued to present with an auditory processing

disorder and receptive language disorder that contributed to her language-based learning

disability and dyslexia; (7) that B.D.S.'s scores on the Clinical Evaluation of Language

Fundamentals-Fourth Edition ("CELF-4") test placed her in the average range of functioning in

the areas of core language, receptive language, expressive language, language content and

language memory; and (8) that "[w]ith continued parental support, school accommodations, and specific intervention programs, prognosis for continued growth [was] positive." Geffner recommended, *inter alia*: (1) that B.D.S.'s classification be changed from "Learning Disabled" to "Speech-language impaired;" (2) that the UFSD continue to provide B.D.S. with classroom and testing accommodations and with reading instruction; (3) that B.D.S. be permitted to use a laptop with Inspiration software in class; (4) that B.D.S. be provided (a) a personal FM ear level unit, i.e., an auditory enhancer, (b) speech-language therapy twice a week, (c) EY services with a reading specialist and speech-language services, (d) support services for writing and a graphic organizer and (e) a Fast ForWord computer program; (5) that B.D.S. be permitted to take a foreign language on a pass-fail basis; and (6) that B.D.S.'s attention in the classroom be monitored.

Progress reports for B.D.S. during the 2005-2006 academic year indicate: (a) that as of March 2006, B.D.S. achieved scores of seventy-two (72), eighty-eight (88) and eighty-three (83) in English language arts subjects, seventy-three (73) in mathematics, seventy-nine (79) in social studies and eighty-one (81) in science; and (2) that as of June 2006, B.D.S. achieved scores of sixty-five (65), ninety (90) and ninety (90) in English language arts subjects, eighty-one (81) in mathematics, seventy-nine (79) in social studies and seventy-eight (78) in science. In addition: (1) Dempsey indicated that B.D.S.'s academic performance fell within the average band; and (2) Kinahan reported that although B.D.S. was progressing in the area of reading, her decoding and fluency skills continued to be weak and she had difficulty with comprehension and organization.

On her final report card for the 2005-2006 academic year, B.D.S. received a grade of "3" in all areas of all subjects, indicating that her performance in all subjects met grade level

expectations.

### 3. Development of B.D.S.'s IEP for the 2006-2007 Academic Year

The CSE met on March 9, 2006 to review the evaluations of Geffner and White, as well as an assistive technology evaluation that had been completed by Tom Rosati. The meeting was attended by B.D.S.; her parents; three (3) of plaintiff's friends, as "family support" members; Thompson; White; Dempsey; Riddell; Mellas; Carriello; the principal of the elementary school; and a parent member. During the meeting: (1) Dempsey reported that B.D.S.'s science skills development and math skills testing scores were within the average range; (2) Mellas reported that B.D.S. actively participated in social studies classes and attained average grades, although she occasionally needed assistance to organize her thought processing and to remind her of the techniques or compensatory skills she was learning; (3) Cariello commended B.D.S. for her persistence of effort in reading and writing skills development; (4) White reported that B.D.S.'s verbal abilities were within the average range, her ability to work with visual perception was above average, her processing speed was "very good," her full scale IQ was in the average band, her working memory was an area of weakness and her fluency and proficiency of computing tasks was delayed; and (5) Geffner recommended that the UFSD provide B.D.S. with EY services in a six (6)-week program at the Landmark School ("Landmark")[7]. The CSE approved the following additional services for B.D.S.: (a) a personal laptop with Microsoft Office for students including One Note; (b) an auditory enhancer, i.e., a Lightspeed Sound System in

---

[7] Landmark is a private, not-for-profit school, located in Prides Crossing, Massachusetts, for students with average to above average IQ who have a specific language-based learning disability.

12

B.D.S.'s classroom; and (c) one-to-one tutoring three (3) hours a week, to be provided as an AI service during the summer of 2006. B.D.S.'s parents did not agree with the summer AI services being offered, as opposed to B.D.S.'s placement at Landmark for the summer, but consented to the other additional services for B.D.S.

On April 24, 2006, Kinahan reported that she did not see any regression in B.D.S.'s skills after long school breaks; that she did not observe B.D.S. as performing significantly below grade level; that she observed B.D.S. to be an average student; that B.D.S.'s decoding skills were "a little weak," but she compensated well for that weakness and her comprehension was good; and that she did not believe B.D.S. was a good candidate for Landmark because it was too restrictive for her.

On April 26, 2006, the CSE met to discuss summer services for B.D.S following her interview and assessment by Landmark. The meeting was attended by B.D.S., plaintiff, three (3) of plaintiff's friends, Thompson, White, Dempsey, Riddell, Mellas, B.D.S.'s speech therapist, the principal and a parent member. During the meeting, Mr. Hicks, who tested B.D.S. for purposes of setting up a program for her at Landmark, reported, *inter alia*: (1) that B.D.S. had attained "some very high scores," particularly on the Linda Mood auditory conceptualization test and word attack skills test, but that her word identification was "significantly lower," and her accuracy and fluency on oral directions was "even lower" yet; (2) that B.D.S. displayed "some difficulty" in raw auditory memory; (3) that B.D.S.'s scores on block design and matrix reasoning were "very strong;" and (4) that B.D.S.'s vocabulary and long term learning were good. Thompson and White indicated that B.D.S. did not legally fit the criteria for EY services and, thus, that any summer program at Landmark for the summer of 2006 could only be approved

as an AI service, and Thompson also indicated that Landmark did not qualify as a legitimate summer program for EY services under state regulations. Nonetheless, the CSE agreed to allow B.D.S. to attend a summer program at Landmark as an AI service during the summer of 2006. (56.1 Stat., ¶ 9). Plaintiff consented to the summer services being provided as an AI service, (56.1 Stat., ¶ 13), although she alleges that she and Thompson "agree[d] to disagree about the service being delivered through the AIS budget * * * [and] about [B.D.S.'s] classification, so long a [sic] [B.D.S.] [received] the service that [met] her needs as decided at the CSE." (Amend. Compl., ¶ 6.56).

4.    B.D.S.'s IEP for the 2006-2007 Academic Year

On May 26, 2006, the CSE conducted its annual review to develop B.D.S.'s IEP for the 2006-2007 academic year (her seventh grade year). (56.1 Stat., ¶ 14). The meeting was attended by B.D.S., her parents, Thompson, the UFSD psychologist, a special education teacher, Riddell, Mellas, Dempsey, Cariello, and two (2) of plaintiff's friends. During the meeting: (1) B.D.S. requested that she be provided with the previously-approved laptop; (2) B.D.S.'s parents reported that the Lightspeed Sound System was not being used in B.D.S.'s classroom; (3) Kinahan reported that B.D.S.'s comprehension and organization were improving and that B.D.S. did not present with weakness in decoding; (4) B.D.S.'s speech therapist reported that B.D.S. continued to present with weakness in auditory word, auditory memory, sentence memory and interpretation of directions, but also presented in the high average range in auditory ability to use thinking and reasoning skills to solve verbal problems and in discrimination of auditory words; and (5) Riddell reported that B.D.S. had not had to use the extended-time testing

14

accommodation. The IEP developed for B.D.S. during the annual review meeting provided for:
(1) resource room services to be increased from three (3) days in every six (6)-day cycle to daily,
commencing on September 6, 2006 until June 13, 2007; (2) use of a graphic organizer with
Inspiration software, an individual auditory enhancer and a laptop in all classes from September
6, 2006 to June 21, 2007; (3) testing accommodations; and (4) textbooks and literature books to
be provided on CD. Plaintiff agreed with the CSE's recommendations for B.D.S.'s 2006-2007
IEP, including the placement of B.D.S. in the program at Landmark for the summer of 2006 as an
AI service, and signed a consent form indicating such agreement. (56.1 Stat., ¶ 15).

B.D.S. attended the summer program at Landmark during the summer of 2006, which
was provided by the UFSD as an AI service. (56.1 Stat., ¶ 10). At all relevant times, Landmark
was not approved by the Commissioner as a school with which the UFSD may contract to
instruct students with disabilities. (56.1 Stat., ¶ 12).

On July 31, 2006, the CSE sub-committee met in order to get feedback from Landmark
regarding B.D.S.'s performance in its summer program and to ascertain "what more [the CSE]
can do for [B.D.S.] on [its] end." The meeting was attended by Thompson, White, a special
education teacher, a regular education teacher, B.D.S., B.D.S.'s parents, three (3) of plaintiff's
friends, a liaison for Landmark, the academic dean for Landmark and a case manager from
Landmark. During the meeting, Thompson, *inter alia*, advised: (1) that she had made it a priority
to get the previously-approved laptop to B.D.S.; that B.D.S.'s books had been ordered on CD;
and that the individual listening device would be ordered as soon as B.D.S. picked out the one
that she wanted; (2) that B.D.S. had made progress in the public school setting, had demonstrated
success on the New York State benchmark exams without having any testing modifications and

had improved in her ability to read, although her fluency was still delayed; (3) that B.D.S. had had a lead role in a school play and was able to memorize her lines and to speak them with "great articulation;" and (4) that there was no indication that the more restrictive Landmark program could be approved by the CSE or UFSD under state regulations. The CSE sub-committee recommended continued placement in the least restrictive environment of UFSD mainstream classes; again offered B.D.S. daily resource room services and accommodations, such as, *inter alia*, use of a graphic organizer with Inspiration software program, a personal auditory enhancer, a laptop in all regular classes, books on CD in English, science and social studies classes, modified homework assignments and preferential seating; and additionally offered B.D.S. a daily one-to-one tutorial period with a special education teacher and individual reading remediation services twice a week. (56.1 Stat., ¶¶ 16-18, 54-56). B.D.S.'s parents did not agree with the CSE sub-committee's recommendations and requested that B.D.S. be placed in Landmark for the 2006-2007 academic year and that the full CSE meet prior to the beginning of that school year. (56.1 Stat., ¶¶ 19-20). After meeting with plaintiff, Gallagher denied her request for a full CSE meeting to be held during the summer and advised her that he had instead instructed that a CSE meeting be scheduled during the beginning of the academic year. (56.1 Stat., ¶¶ 21-22).

On August 18, 2006, plaintiff requested an impartial hearing, (56.1 Stat., ¶ 23), alleging, *inter alia*, that B.D.S. was being denied an FAPE for the 2006-2007 academic year and seeking pendency placement for B.D.S. at Landmark and reimbursement for B.D.S.'s tuition at Landmark. (56.1 Stat., ¶¶ 28-29). By letter dated August 25, 2006, plaintiff was notified that a full CSE meeting had been scheduled, in accordance with Gallagher's instructions, for September 11, 2006. (56.1 Stat., ¶ 24). By letter dated September 8, 2006, plaintiff requested

that the CSE meeting be cancelled because she had filed a request for an impartial hearing. (56.1 Stat., ¶ 25).

B.D.S. attended Landmark during the 2006-2007 academic year (her seventh grade year) and her parents paid the tuition therefor. (56.1 Stat., ¶¶ 26-27).

An eight (8) day hearing was conducted before IHO Michael Lazan ("IHO Lazan") between October 23, 2006 and April 27, 2007, during which, *inter alia*: (1) Dempsey testified that B.D.S. "fell within the average range," performed in the average band, i.e., in the mid-seventies to low eighties, in her mainstream science and math classes, and was an average student academically, (56.1 Stat., ¶¶ 30-32); (2) Mellas testified that B.D.S. was "fairly proficient," performed as well as most of the other students and was an average performer in social studies class, i.e., averaging test scores in the high seventies to low eighties range, (56.1 Stat., ¶¶ 34-35); (3) Cariello testified that B.D.S. was in the average band in reading and in the low average band for written language and overall language skills as compared to her peers in the class, that B.D.S. had accomplished all of the sixth grade material and demonstrated growth during her sixth grade year and that B.D.S. had played a lead role in the school play in 2005, (56.1 Stat., ¶¶ 37-40); and (4) Riddell testified that he focused on the skills with which B.D.S. displayed difficulty and tried to improve her study and work habits during resource room instruction, that B.D.S.'s November 2005 cognitive and educational evaluations were "acceptable," with the exception that her grade equivalent scores for working memory, broad reading and reading fluency were low compared to her performance in the resource room, and that B.D.S.'s level of effort was on line with most sixth graders. (56.1 Stat., ¶¶ 41-44). In addition, evidence was presented during the hearing that B.D.S. was liked by her peers; did not

exhibit any behavioral problems; was active with extracurricular activities, including skiing and drama; achieved an average level on the New York State English Language Arts assessment without IEP accommodations; and performed within acceptable grade level expectations during the 2005-2006 academic year (her sixth grade year). (56.1 Stat., ¶¶ 45-49).

By decision dated January 19, 2007, IHO Lazan, *inter alia*, effectively denied plaintiff's request for pendency at Landmark by deeming pendency to be "the resource room 5:1 program agreed to and implemented from the May 11, 2005 IEP." IHO Lazan found, *inter alia*, that B.D.S.'s placement at Landmark was "clearly temporary for the summer of 2006." IHO Lazan's January 19, 2007 decision was never appealed.

By decision dated September 5, 2007, IHO Lazan, *inter alia*, denied plaintiff's request for reimbursement of B.D.S.'s tuition at Landmark for the 2006-2007 academic year, finding, *inter alia*: (1) that B.D.S. had attained passing grades in all of her subjects and had largely performed in the average band during the 2005-2006 academic year at the UFSD; (2) that test results showed that B.D.S. had achieved "significant progress" in certain areas, including semantic relationships, word definitions, formulated sentences, sentence assembly, Word Classes 1 and 2, Word Classes receptive ability and Word Classes expressive ability; (3) that the special education program and services offered by the UFSD for B.D.S. for the 2006-2007 academic year were very similar to the program and services she had during the 2005-2006 academic year, with which she had progressed, and, thus, "would have been likely to produce progress for 2006-2007;" and (4) that although the UFSD had committed certain procedural violations, B.D.S.'s parents had failed to show how those violations significantly impacted B.D.S.'s FAPE. (56.1 Stat., ¶¶ 57-59).

On October 13, 2007, plaintiff petitioned for review of IHO Lazan's September 5, 2007

decision by the NYSED State Review Office pursuant to 20 U.S.C. § 1415(g). By decision dated

January 2, 2008, state review officer ("SRO") Kelly dismissed the appeal of IHO Lazan's

September 5, 2007 decision, finding, *inter alia*: (1) that the hearing record supported IHO

Lazan's determinations (a) that B.D.S.'s parents had failed to show how the procedural violations

by the UFSD had significantly impacted B.D.S.'s FAPE and (b) that the UFSD had offered

B.D.S. a FAPE for the 2006-2007 academic year; and (2) that since there was no basis in the

record to conclude that B.D.S. required a full-time special education program in order to meet

her needs, placement at Landmark would have been overly restrictive for B.D.S. (56.1 Stat., ¶¶

60-62).


### 5. Facts Pertaining to Services for the Summer of 2007

On June 15, 2007, the CSE met via teleconference to conduct B.D.S.'s annual review and

to prepare her IEP for the 2007-2008 academic year (her eighth grade year). (56.1 Stat., ¶¶ 67,

71). The meeting was attended by Thompson, White, Butta, Cahill, a parent member, three (3)

of plaintiff's friends, plaintiff, B.D.S., the school liaison for Landmark, a case manager for

Landmark, and five (5) teachers from Landmark. Before the meeting, Landmark had provided

the CSE with a student report, dated January 12, 2007, which included progress reports prepared

by B.D.S.'s teachers at Landmark during the 2006-2007 academic year, a draft IEP prepared by

Landmark staff, results of tests that had been administered by Landmark and samples of work

that had been completed by B.D.S. while attending Landmark. (56.1 Stat., ¶ 68). During the

meeting: (1) the CSE reviewed Landmark's draft IEP; (2) Landmark staff advised the CSE that

B.D.S's test scores had improved in the areas of word attack, word identification, reading rate, reading accuracy and reading fluency when compared to her test scores in 2006; (3) the CSE reviewed B.D.S.'s test scores, which reflected improvement in the areas of reading vocabulary, reading comprehension, math problem solving, math procedures and spelling; and (4) the liaison for Landmark recommended that B.D.S. (a) receive EY services at Landmark for the summer of 2007 and (b) attend Landmark during the 2007-2008 academic year. (56.1 Stat., ¶¶ 73, 74, 77). Both plaintiff and B.D.S. contributed significantly to the information provided during the meeting. (56.1 Stat., ¶ 76). Thompson: (1) advised the CSE that based upon the information presented during the meeting, B.D.S.'s needs could be met within the UFSD and, therefore, the recommendation was for B.D.S. to return to the UFSD; and (2) explained that B.D.S.'s test scores (a) did not support an out-of-state placement, (b) supported a public school placement as B.D.S.'s least restrictive environment and (c) did not support EY services during the summer of 2007 because there was no evidence of regression. (56.1 Stat., ¶ 78-81, 91). The CSE recommended that B.D.S.: (1) be placed in the UFSD's inclusion classes with accommodations, including Kurtzweil software on her laptop, use of a graphic organizer with Inspiration software and use of an individual auditory enhancer; and (2) receive (a) daily one-on-one tutoring with a certified reading teacher and daily resource room support during the 2007-2008 academic year[8] and (b) reading remediation as an AI service for three (3) hours a week for eight (8) weeks during the summer of 2007. (56.1 Stat., ¶¶ 75, 82, 91).

On July 16, 2007, B.D.S., plaintiff, three (3) of plaintiff's friends and Thompson attended

_____

[8] The IEP for B.D.S. for the 2007-2008 academic year (eighth grade) is not at issue in this case.

a resolution meeting regarding the summer services being offered by the UFSD for B.D.S. At the meeting, Thompson indicated, *inter alia*: (1) that B.D.S. had been approved to receive reading remedial services three (3) times a week for eight (8) weeks with a qualified reading instructor over the summer of 2007, but did not qualify for EY services because there was no history of regression; (2) that the IEP developed during the June 15, 2007 meeting transposed all of the goals from Landmark's draft IEP but was for services to be provided within the UFSD from September 5, 2007 to June 17, 2008; (3) that the UFSD would approve a neuropsychological evaluation of B.D.S., following which plaintiff could request an independent neuropsychological evaluation if she did not agree with the results; and (4) that the UFSD would approve an independent evaluation of B.D.S. for auditory processing disorder and speech by Dr. Geffner. Plaintiff agreed with the additional evaluations but not with the summer services being offered and requested that another CSE meeting be scheduled to discuss the issue of whether B.D.S. qualified for EY services.

On June 22, 2007, plaintiff filed a due process complaint relating to the services to be provided to B.D.S. during the summer of 2007 and seeking pendency placement for B.D.S. at Landmark. On August 13, 2007, plaintiff amended her due process complaint to seek reimbursement for ninety (90) hours of compensatory services in lieu of pendency placement at Landmark, since B.D.S. had not attended a summer program at either the UFSD or Landmark during the summer 2007. (56.1 Stat., ¶¶ 63-66).

On June 28, 2007, IHO Susan Lushing ("IHO Lushing") denied plaintiff's request for pendency at Landmark during the summer of 2007, which plaintiff appealed to the NYSED. By decision dated September 19, 2007, SRO Kelly dismissed plaintiff's appeal.

Between August 22, 2007 and September 27, 2007, a four (4) day hearing was held before IHO Lushing relating to the services offered to B.D.S. for the summer of 2007. (56.1 Stat., ¶ 84). During the hearing, *inter alia*, Riddell, Mellas and Dempsey all testified that they saw little or no regression in B.D.S.'s skills after she returned from long school breaks; Nobile explained that her testing of B.D.S. in 2004, near the beginning of the academic year, presented a student whose regression was within normal limits; and evidence was presented of testing performed by Landmark in September 2007 which did not support Landmark's expectation of regression in B.D.S.'s skills. (56.1 Stat., ¶¶ 85-89).

By decision dated November 11, 2007, IHO Lushing: (1) found, *inter alia*: (a) that the UFSD correctly determined that B.D.S. did not meet the definition to qualify for EY services, and (b) that even though B.D.S. had not attended summer services at the UFSD, her parents had established that such services would have been "uncertain at best and possibly unavailable" and, therefore, had plaintiff placed B.D.S. in the Landmark program during the summer of 2007, IHO Lushing would have ordered the UFSD to reimburse her tuition therefor; and (2) awarded B.D.S. twenty-four (24) hours of supplementary one-to-one remedial tutoring at Landmark, not to exceed two thousand four hundred dollars ($2,400.00), as compensatory services. (56.1 Stat., ¶¶ 92-94).

In or about December 2007 or January 2008, the UFSD petitioned the NYSED for review of so much of IHO Lushing's November 11, 2007 decision as awarded plaintiff compensatory services. (56.1 Stat., ¶ 95). By decision dated February 8, 2008, SRO Kelly sustained the appeal and annulled IHO Lushing's decision, finding, *inter alia*: (1) that plaintiff had not sustained her burden of establishing that the AI services offered by the UFSD for the summer of 2007 were not

appropriate; (2) that the record showed that the UFSD had historically offered and provided summer services to both its regular education and special education students, including B.D.S.; (3) that the UFSD had offered the AI services referred to in B.D.S.'s IEP during the summer of 2007 but B.D.S. had not availed herself of those services; and (4) that the IHO had improperly awarded compensatory services absent any determination that B.D.S. had been denied an FAPE by the UFSD. (56.1 Stat., ¶¶ 96-99).

### B.    Procedural History

On April 1, 2008, plaintiff, individually and on behalf of B.D.S., commenced an action against the UFSD defendants, Kelly and Ingerman Smith, alleging, *inter alia*, violations of the IDEA, the Rehabilitation Act, Sections 1983 and 1985, the ADA, the New York Education Law and the New York Constitution. On May 8, 2008, plaintiff, individually and on behalf of B.D.S., commenced a second action against the same defendants, the additional UFSD defendants and the NYSED. Thereafter, Ingerman Smith and Kelly moved, *inter alia*, pursuant to Rule 12 of the Federal Rules of Civil Procedure to dismiss the amended complaints filed in both actions as against them.

By order entered June 26, 2009, this Court, *inter alia*: (a) consolidated Actions No. 1 and 2; (b) denied, *inter alia*, the branches of Ingerman Smith's motion seeking dismissal of the amended complaints pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; (c) dismissed plaintiff's Section 1983, Section 1985 and state law claims as against Ingerman Smith without prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, and *sua sponte* dismissed plaintiff's Section 1985 claims as against all other

defendants without prejudice for failure to state a claim; (d) dismissed plaintiff's ADA and Rehabilitation Law claims as against Ingerman Smith, Kelly and all individual defendants with prejudice for failure to state a claim; (e) dismissed plaintiff's claims as against Kelly with prejudice, but granted her leave to amend the pleadings to assert a claim seeking a declaratory judgment based upon any ongoing violation of federal law by Kelly; (f) *sua sponte* dismissed plaintiff's ADA claims in both actions, and her Rehabilitation Act claim in Action No. 2, as against the UFSD and NYSED without prejudice; and (g) directed plaintiff to retain counsel or move for the appointment of counsel on behalf of B.D.S. within thirty (30) days or all claims asserted on behalf of B.D.S. would be dismissed in their entirety without prejudice.

On July 22, 2009, Ingerman Smith filed a notice of appeal of so much of the June 26, 2009 order as denied the branches of its motion seeking dismissal of plaintiff's claims against it with prejudice as barred by the doctrines of absolute or qualified immunity. By mandate entered December 28, 2010, the United States Court of Appeals for the Second Circuit dismissed Ingerman Smith's appeal as not ripe for review in light of this Court's finding, undisputed by Ingerman Smith on the appeal, that the amended complaints in both actions did not adequately allege any conduct by Ingerman Smith sufficient to state a claim for a violation of plaintiff's rights. B.D.S. v. Ingerman Smith L.L.P., No. 09-3177-cv (2d Cir. Oct. 22, 2010) (summary order).

On September 21, 2009, plaintiff filed an amended complaint, which became the operative pleading in the consolidated action, and moved for the appointment of counsel on behalf of B.D.S. By order entered October 2, 2009, plaintiff's motion for the appointment of counsel was denied with leave to renew within thirty (30) days upon submission of an

appropriate financial affidavit and plaintiff was advised that her failure to timely renew the motion, to secure pro bono counsel or to retain counsel on behalf of B.D.S. would result in dismissal of the claims asserted on behalf of B.D.S. in their entirety without prejudice.

Kelly and the NYSED subsequently moved pursuant to Rules 12(b)(1) and (5) of the Federal Rules of Civil Procedure to dismiss the amended complaint against Kelly as barred by the doctrine of absolute immunity and against Kelly and the NYSED for improper service of process, respectively; and Ingerman Smith moved pursuant to Rules 12(b) and (c) of the Federal Rules of Civil Procedure to dismiss the amended complaint as against it and for judgment on the pleadings, respectively. By order dated April 26, 2011, *inter alia*: (1) the branches of Ingerman Smith's motion seeking judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure were granted and plaintiff's claims were dismissed in their entirety with prejudice as against Ingerman Smith; (2) the branch of Kelly's and the NYSED's motion seeking dismissal of plaintiff's claims against Kelly as barred by the doctrine of absolute immunity was granted and plaintiff's claims were dismissed in their entirety with prejudice as against Kelly; (3) the branch of Kelly's and the NYSED's motion seeking dismissal of the amended complaint against the NYSED pursuant to Rule 12(b)(5) for insufficient service of process was granted and the amended complaint was dismissed in its entirety without prejudice as against the NYSED; (4) plaintiff's Section 1985 claims were dismissed in their entirety with prejudice; and (5) all claims asserted on behalf of B.D.S. were dismissed in their entirety without prejudice. Accordingly, only the following claims remain in this action: (1) the Section 1983 and 1988 claims asserted by plaintiff, individually, against the UFSD defendants and additional UFSD defendants; (2) the IDEA, Rehabilitation Act and ADA claims asserted by plaintiff, individually, against the UFSD;

and (3) Ingerman Smith's counterclaim against plaintiff.


1.    The Amended Complaint in the Consolidated Action

With respect to the remaining Section 1983 claims, the amended complaint filed in the

consolidated action alleges, *inter alia*: (1) that Thompson, White, Butta, Cahill, Mellas, Riddell

and Dempsey denied B.D.S. her right to a FAPE by "deliberately misconstru[ing] special

education services awarded to [B.D.S.] as general education services," (first Section 1983 causes

of action[9]) (Amend. Compl., ¶¶ 7.4, 8.4); (2) that the BOE defendants and Gallagher denied

B.D.S. her right to a FAPE by refusing to enact a "policy on providing AIS services to their

students," as required by the New York State Education Law, (Amend. Compl., ¶¶ 7.5, 8.7)

(second Section 1983 causes of action); (3) that Gallagher denied B.D.S. her right to a FAPE by

"misusing his authority" to recommend that the BOE defendants approve her "special education

services as AIS services in addition to the hiring of outside providers for [B.D.S.'s] so called

[sic] 'AIS' services," (third Section 1983 causes of action) (Amend. Compl., ¶¶ 7.6, 8.9); and (4)

that the UFSD's attempt "to strip [B.D.S.] of her right to special education services by disguising

them * * * [as] AIS Services, is illegal." (fourth Section 1983 cause of action (Lushing))

---

[9]  Plaintiff designates two (2) causes of action as "First Cause of Action Under 42 USC §
1983," one pertaining to IHO's Lazan decision, (Amend. Compl., ¶ 7.4), and one pertaining to
IHO Lushing's decision, (Amend. Compl., ¶ 8.4). The two (2) causes of action are essentially
identical, with the exception that the one pertaining to IHO Lazan's decision is asserted against
Thompson, White and Dempsey only, whereas the cause of action pertaining to IHO Lushing's
decision is asserted against Butta, Cahill, Mellas and Riddell as well.  Similarly, plaintiff asserts
two (2) Section 1983 causes of action designated as "Second," "Third," "Fifth" and "Sixth,"
respectively, (Amend. Compl., ¶¶ 7.5-7.6, 7.11-7.16, 8.7-8.8, 8.14-8.20), but those duplicate
causes of action are virtually identical, in relevant part.  Accordingly, there is no need to
distinguish between those causes of action.

(Amend. Compl. ¶ 8.12). In addition, plaintiff alleges, *inter alia*: (1) that the UFSD violated the IDEA by, *inter alia*: (a) failing to properly evaluate B.D.S. or to develop an appropriate IEP; and (b) denying to fund the private school educational services B.D.S. needed at Landmark, (Amend. Compl., ¶¶ 11.06-11.14; 12.6-12.14); and (2) that the UFSD retaliated against plaintiff in violation of the Rehabilitation Act and the ADA, *inter alia*: (a) by rejecting, "for the first time ever," a CSE's recommendation, i.e., placement at Landmark for the 2008-2009 academic year and EY services for B.D.S.'s sibling; (b) by hiring Kollmar, an outside contractor, to conduct B.D.S.'s CSE meetings; and (c) as a result of public comments made by Gallagher about plaintiff and her family, (Amend. Compl., ¶¶ 13.2-14.1).

Plaintiff seeks: (1) judgment declaring (a) that the UFSD denied B.D.S. a FAPE for the 2006-2007 academic year and the summer of 2007, (b) that B.D.S. "is entitled to educational services to compensate for her loss of educational opportunity caused by the [UFSD's] failure to provide her appropriate programming and services from September 2006" through August 30, 2007, and (c) that B.D.S. "has derived meaningful educational benefit from the special education services she has received at Landmark School;" (2) reimbursement (a) "for all costs of [B.D.S.'s] lost [sic] of Educational services, educational opportunity and documented regression" and (b) "for all costs of [B.D.S.'s] placement at Landmark School, * * *," for the academic years * * * 2006-2007, and the summer of 2007; and (3) costs and attorney's fees on this action and the administrative proceedings pursuant to 20 U.S.C. § 1415(i)(3)(B). (Amend. Compl., pp. 79-80).

Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiff's remaining claims in their entirety. Plaintiff has failed to timely oppose the motion.

II.    Discussion

    A.    Rehabilitation Act, ADA and Section 1983 Claims

        1.    Standard of Review

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011), cert. denied, 132 S. Ct. 1744 (2012) (accord). "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that summary

judgment is appropriate when the non-moving party has no evidentiary support for an essential element for which it bears the burden of proof).

If the district court determines that there is a genuine dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Spinelli, 579 F.3d at 166 (internal quotations and citation omitted), to determine whether there is a genuine issue for trial. See Ricci, 557 U.S. 557, 129 S.Ct. at 2677. "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Rojas, 660 F.3d at 104 (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505); see also Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (holding that a genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." (citation omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 557 U.S. 557, 129 S.Ct. at 2677 (quoting Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

"The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citation omitted); see also Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010) (accord), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011); see also Spinelli, 579 F.3d at 166. Once the moving party meets its burden, the nonmoving party can only defeat summary judgment "by

coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. Spinelli, 579 F.3d at 166 (internal quotations and citations omitted); see also Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (quoting Matsushita Elec., 475 U.S. at 586, 106 S. Ct. 1348).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record * * *; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(e) provides, in relevant part, that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: * * * (2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials– including the facts considered undisputed– show that the movant is entitled to it; * * *." Fed. R. Civ. P. 56(e). "Rule 56(e) * * * requires the nonmoving party to *go beyond the pleadings* and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file [as well as documents, electronically stored information, stipulations and other materials, see Fed. R. Civ. P. 56(c)(1)(A)],' designate 'specific facts showing that there is a

genuine issue for trial." Celotex Corp., 477 U.S. at 324, 106 S. Ct. 2548 (emphasis added).

"Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves * * *,*" Id. (emphasis added); see also Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001) ("In general, a party opposing a properly supported motion for summary judgment is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion."), unless the pleadings are verified in a manner "equivalent of the oath that would be given with respect to an affidavit," Fitzgerald, 251 F.3d at 361, and assert factual matters other than upon "information and belief." Id. "In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (internal quotations and citations omitted). "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory * * * or based on speculation." Id. at 310; see also Brown, 654 F.3d at 358 (holding that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment).

"Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact. * * * If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." Giannullo v. City of New York, 322 F.3d 139, 140

31

(2d Cir. 2003); see also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) ("A party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. See Local Rule 56.1(b). The facts set forth in a moving party's statement 'will be deemed to be admitted unless controverted' by the opposing party's statement. Local Rule 56.1(c)."); Local Civ. R. 56.1(a)-(c). Local Civil Rule 56.1(d) requires that "[e]ach [56.1] statement by the movant or opponent * * *, including each statement controverting any statement of material fact, [] be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Courts may decline to "consider as disputed any statement [in the movants' Local Rule 56.1 statement] supported by admissible evidence to which [the non-movant] objects, but does not support with evidence, * * *, in perfect accordance with Local Rule 56.1(d), * * *." Feis v. United States, 394 Fed. Appx. 797, 799 (2d Cir. Oct. 1, 2010) (summary order) (quotations and emphasis omitted). "[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." Holtz, 258 F.3d at 74. "[A]llegations * * * cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement." Id. at 73. "[W]here there are no[] citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion," Id. at 73-4 (quotations and citations omitted), and review the record independently. Id. at 74.

### 2. Rehabilitation Act and ADA Claims

Defendants allege that the Rehabilitation Act and ADA claims set forth in plaintiff's amended complaint must be dismissed because plaintiff failed to correct the pleading

32

deficiencies upon which those claims, as set forth in the original complaints, had previously been dismissed.

In the June 26, 2009 order, plaintiff's Rehabilitation Act and ADA claims were dismissed without prejudice on the basis that plaintiff only conclusorily referred to those statutes in the original complaints and did not assert any specific cause of action under those statutes. See, e.g. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. * * *While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). In order to state a claim under either statute, a plaintiff must allege: (1) that he or she is a qualified individual with a disability; (2) that the defendants are subject to the relevant statute; and (3) that he or she was denied the opportunity to participate in or benefit from the defendants' services, programs or activities, or was otherwise discriminated against by defendants, by reason of his or her disability. See Shomo v. City of New York, 579 F.3d 176, 185 (2d Cir. 2009); Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009).

"Under the ADA and the Rehabilitation Act, a demand for 'reasonable accommodations to assure access to an existing program' is cognizable; but a demand for 'additional or different substantive benefits' is not." Streck v. Board of Education of East Greenbush School District, 280 Fed. Appx. 66, 68 (2d Cir. May 30, 2008) (summary order) (quoting Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (per curiam)); see also J.D. ex rel. J.D. v. Pawlet School District, 224 F.3d 60, 70 (2d Cir. 2000) ("[U]nder [Rehabilitation Act] regulations, a student may have a viable discrimination claim * * * provided [he or she] establishes that he or she does not enjoy equal access to the school's programs. * * * [T]he duty to provide a [FAPE] is not without limits.

33

* * * [T]he Rehabilitation Act distinguishes 'between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps.' Southeastern Community College v. Davis, 442 U.S. 397, 410, 99 S. Ct. 2361, 60 L.Ed.2d 980 (1979). While a federal funds recipient must offer 'reasonable' accommodations to individuals with disabilities to ensure meaningful access to its federally funded program, § 504 [of the Rehabilitation Act] does not mandate 'substantial' changes to its program.")

Although plaintiff was afforded the opportunity to re-plead the Rehabilitation Act and ADA claims, she has not corrected the pleading deficiencies with respect to those claims, i.e., she only conclusorily refers to those statutes and fails to allege, *inter alia*, any discrimination by reason of disability beyond a purported failure to provide B.D.S. with an FAPE, which is insufficient to state a claim under either statute. See, e.g. French v. New York State Department of Education, No. 10-4298-cv, 2011 WL 5222856, at * 4 (2d Cir. Nov. 3, 2011) (summary order) (affirming dismissal of the plaintiff's ADA and Rehabilitation Act claims on the basis that a violation of the IDEA, without more, is insufficient to support a claim of disability-based discrimination under the ADA or Section 504 of the Rehabilitation Act); E.H. v. Board of Education of Shenendehowa Central School District, 361 Fed. Appx. 156, 161 (2d Cir. Oct. 16, 2009) (summary order) (accord). Moreover, the record establishes, *inter alia*, that defendants identified B.D.S. as a student with a disability and created and implemented an IEP for B.D.S. with which she had previously shown significant progress and, therefore, that B.D.S. had been afforded access to an existing program. See, e.g. Streck, 280 Fed. Appx. at 68 (finding that the plaintiff had been afforded access to an existing program by virtue of his classification as a student with a disability and the creation and implementation of an IEP); J.D. ex rel. J.D., 224

F.3d at 71 (finding that the School District's refusal to fund the infant plaintiff's enrollment in a private school, without more, did not amount to discrimination where the School District had proposed a multi-component IEP that responded to the major recommendations of the infant plaintiff's psychologist, particularly since the Rehabilitation Act's "regulatory scheme expresses a preference for mainstreaming students with disabilities in a school district's regular school environment, unless that objective cannot be achieved even with the aid of supplementary services.") Plaintiff's challenges to the contents and sufficiency of the IEP developed for B.D.S. for the 2006-2007 academic year and summer of 2007 demand "additional or different substantive benefits" not cognizable under the Rehabilitation Act or ADA. See, e.g. Streck, 280 Fed. Appx. at 68 (affirming dismissal of the plaintiff's ADA and Rehabilitation Act claims since he challenged only the content and sufficiency of the IEP created and implemented for him and, thus, demanded "additional or different substantive benefits.") Neither stature "require[s] a public school district to provide students with disabilities with potential-maximizing education, only reasonable accommodations that give those students the same access to the benefits of a public education as all other students." J.D. ex rel. J.D., 224 F.3d at 71. Since the record establishes that defendants offered B.D.S. a specific program designed to address her needs within the UFSD and that her attendance at Landmark was not necessary in order to provide her with an FAPE, the branch of defendants' motion seeking dismissal of plaintiff's Rehabilitation Act and ADA claims is granted and those claims are dismissed in their entirety with prejudice.

3.    Section 1983 Claims

Although monetary damages are available in claims brought pursuant to Section 1983 for

the denial of procedural safeguards or access to administrative remedies under the IDEA, see Polera v. Board of Education of Newburgh Enlarged City School District, 288 F.3d 478, 483 n. 5 (2d Cir. 2002); Quackenbush v. Johnson City School District, 716 F.2d 141, 148 (2d Cir. 1983), the record does not establish that plaintiff was denied such procedural safeguards or administrative remedies in violation of the IDEA. The IDEA provides, in relevant part, that "[a]ny State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies." 20 U.S.C. § 1415(a). The relevant procedures required by the IDEA include: (1) "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a [FAPE] to such child, and to obtain an independent educational evaluation of the child;" (2) "[w]ritten prior notice to the parents of the child * * * whenever the local educational agency– (A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to the child;" and (3) "[a]n opportunity for any party to present a complaint– (A) with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child; * * *." 20 U.S.C. § 1415(b)(1), (3) and (6).

The IDEA further provides that "[w]henever a complaint has been received under subsection (b)(6) * * *, the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing * * *." 20 U.S.C. § 1415(f)(1)(A).

The IDEA requires the hearing officer to render a decision "on substantive grounds based on a determination of whether the child received a [FAPE]," 20 U.S.C. § 1415(f)(3)(E)(i), and, where procedural violations are alleged, allows a hearing officer to "find that a child did not receive a [FAPE] only if the procedural inadequacies– (I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits," 20 U.S.C. § 1415(f)(3)(E)(ii). "A decision made in a [due process] hearing * * * shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (g) and paragraph (2)." 20 U.S.C. § 1415(i)(1)(A).

Subsection (g) provides that "any party aggrieved by the findings and decision rendered in [an impartial due process] hearing may appeal such findings and decision to the State educational agency * * * [which] shall conduct an impartial review of the [hearing officer's] findings and decision * * *." 20 U.S.C. § 1415(g). The statute requires the state review officer to "make an independent decision upon completion of such review," 20 U.S.C. § 1415(g)(2), which "shall be final, except that any party may bring an action under paragraph (2) [of the statute]," 20 U.S.C. § 1415(i)(1)(B).

In addition, regulations promulgated by the Commissioner provide the following procedural due process requirements: (1) that prior written notice be given to the parents of a student with a disability within "a reasonable time before the school district proposes to or refuses to initiate or change the * * * educational placement of the student or the provision of a [FAPE] to the student;" (2) that "reasonable efforts" be made to obtain the written informed consent of the parent whenever required; (3) that written notification be provided of all CSE

meetings at least five (5) days prior to the meeting; (4) that reasonable steps be taken "to ensure that one or both of the student's parents are present at each [CSE] meeting or are afforded the opportunity to participate * * *;" (5) that the confidentiality of personally identifiable data, information or records pertaining to the student be preserved; (6) that the procedural safeguards notice prescribed by the Commissioner be used; (7) that an independent educational evaluation be made available at public expense each time the school district conducts an evaluation with which the parent disagrees; (8) that procedures be implemented to allow resolution of any disputes through a voluntary mediation program; and (9) that opportunities be provided (a) to file a due process complaint "with respect to any matter relating to the * * * educational placement of a student with a disability, * * * or the provision of a [FAPE] to such student," (b) to request an impartial due process hearing and (c) to appeal the findings of fact and decisions of the independent hearing officer to a state review officer of the NYSED. 8 N.Y.C.R.R. § 200.5.

Since plaintiff was afforded, *inter alia*: (1) meaningful opportunities (a) to discuss the educational placement of B.D.S. and the provision of an FAPE to her, including the designation of the services provided to B.D.S. as AI services, as opposed to EY services, and (b) to present due process complaints relating to the educational placement of B.D.S. and the provision of an FAPE to her; (2) impartial due process hearings, at which she raised, *inter alia*, the designation of the services provided to B.D.S. as AI services; and (3) impartial review of the findings and decisions of the IHOs by a state review officer, she was afforded substantially all of the procedural safeguards of the IDEA and all of the process due her. Accordingly, the branch of defendants' motion seeking dismissal of plaintiff's Section 1983 claims is granted and those claims are dismissed in their entirety with prejudice. See, e.g. French, 2011 WL 5222856, at *4

38

(affirming dismissal of Section 1983 claim which lacked any factual basis other than the alleged

IDEA violations and the related allegation of discrimination); <u>Streck</u>, 280 Fed. Appx. at 68

(holding that the plaintiffs may not rely on Section 1983 to pursue monetary damages for

violations of the IDEA where they had been afforded a hearing by an IHO and review by an

SRO).

a.    <u>Monell</u> Claim

Plaintiff has also not established a claim against the UFSD pursuant to <u>Monell v.

Department of Social Services of City of New York</u>, 436 U.S. 658, 690-1, 98 S.Ct. 2018, 56

L.Ed.2d 611 (1978).

A municipality or municipal entity cannot be held liable under Section 1983 on a

*respondeat superior* theory. <u>See Monell</u>, 436 U.S. at 691, 98 S.Ct. 2018; <u>see also</u> <u>Connick v.

Thompson</u>, 131 S.Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (5-4 decision) (holding that under

Section 1983, governmental bodies are not vicariously liable for their employees' actions); <u>Los

Angeles County, California v. Humphries</u>, 131 S.Ct. 447, 452, 178 L.Ed.2d 460 (2010) ("[A]

municipality cannot be held liable solely for the acts of others, <u>e.g.</u>, *solely* because it employs a

tortfeasor." (emphasis in original) (quotations and citation omitted)). Rather, "a plaintiff must

demonstrate that, through its deliberate conduct, the municipal[] [entity] was the 'moving force'

behind the alleged injury." <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 37 (2d Cir. 2008) (quoting

<u>Board of County Commissioners of Bryan County, Okl. v. Brown</u>, 520 U.S. 397, 404, 117 S.Ct.

1382, 137 L.Ed.2d 626 (1997)); <u>see also</u> <u>Amnesty America v. Town of West Hartford</u>, 361 F.3d

113, 125 (2d Cir. 2004) ("Demonstrating that the municipality itself caused or is implicated in

the constitutional violation is the touchstone of establishing that a municipality can be held liable

39

for unconstitutional actions taken by [its] employees.")

"For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under <u>Monell</u>." <u>Kantrowitz v. Uniondale Union Free School District</u>, 822 F.Supp.2d 196, 217 (E.D.N.Y. 2011) (quoting <u>Booker v. Board of Education, Baldwinsville Central School District</u>, 238 F.Supp.2d 469, 475 (N.D.N.Y. 2002)); <u>see also</u> <u>Schreiber v. East Ramapo Central School District</u>, 700 F.Supp.2d 529, 560 (S.D.N.Y. 2010); <u>Rafano v. Patchogue-Medford School District</u>, No. 06-CV-5367, 2009 WL 789440, at * 8 (E.D.N.Y. Mar. 20, 2009). Thus, to prevail on a Section 1983 claim against a school district, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the [school district] caused the constitutional injury." <u>Roe</u>, 542 F.3d at 36; <u>see also</u> <u>Connick</u>, 131 S.Ct. at 1359 ("Plaintiffs who seek to impose liability on local governments under Section 1983 must prove that 'action pursuant to official municipal policy' caused their injury." (quoting <u>Monell</u>, 436 U.S. at 691, 98 S.Ct. 2018)); <u>Humphries</u>, 131 S.Ct. at 452 ("[A] municipality may be held liable when execution of a government's *policy or custom* . . . inflicts the injury." (emphasis in original) (quotations and citation omitted)).

"A municipal policy may be pronounced or tacit and reflected in either action or inaction." <u>Cash v. County of Erie</u>, 654 F.3d 324, 334 (2d Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 1741 (2012). "In the latter respect, a '[school district's] policy of inaction in light of notice that its program will cause constitutional [or statutory] violations is the functional equivalent of a decision by the [school district] itself to violate the Constitution [or federal law].'" <u>Id.</u> (quoting <u>Connick</u>, 131 S. Ct. at 1360).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 131 S.Ct. at 1359; see also Hurdle v. Board of Education of City of New York, 113 Fed. Appx. 423, 424-25 (2d Cir. 2004) (summary order) ("A school district's liability under Monell may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" (quoting Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004) (quotations and citations omitted))). In addition, "[i]n limited circumstances, a * * * decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983." Connick, 131 S.Ct. at 1359.

Moreover, "where a policymaking official exhibits deliberate indifference to constitutional [or statutory] deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a [municipal] policy or custom that is actionable under § 1983." Amnesty America, 361 F.3d at 126. The deliberate indifference standard is "a stringent standard of fault," Cash, 654 F.3d at 334 (quoting Connick, 131 S. Ct. at 1360), with "[t]he operative inquiry [being] whether th[e] facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" Id. (quoting Connick, 131 S. Ct. at 1360). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional [or statutory] violations was obvious, * * * but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs * * *." Id. (quotations, alterations and citations omitted).

41

The basis of plaintiff's <u>Monell</u> claim against the UFSD is that it, acting through its officials, "illegal[ly]" attempted "to strip [B.D.S.] of her right to special education services by disguising them * * * [as] AIS services * * *," as opposed to EY services. (Amend. Compl., § 8.12). Plaintiff does not allege that any of the individual defendants acted pursuant to an official policy or longstanding practice or custom or challenge the UFSD's supervision or training of the individual defendants, nor does the record contain any evidence from which a reasonable jury could find that any policymaking official of the UFSD exhibited deliberate indifference to a known or obvious constitutional or statutory deprivation caused by a subordinate.

To the extent plaintiff's <u>Monell</u> claim is based upon the acts of the UFSD's final policymakers, i.e., the BOE defendants, that claim is merely a reiteration of her IDEA claim, insofar as she challenges only the BOE defendants' noncompliance with the IDEA, i.e., its purported failure to enact a policy on providing AI services to its students. As noted above, plaintiff has not established that she was denied any procedural safeguards or administrative remedies under the IDEA with respect to such a claim. <u>See, e.g.</u> <u>French v. New York State Department of Education</u>, No. 5:04-CV-434, 2010 WL 3909163, at * 11 (N.D.N.Y. Sept. 30, 2010), <u>aff'd</u>, — Fed. Appx. —, 2011 WL 5222856 (2d Cir. Nov. 3, 2011). Nor is there any basis in the record from which a reasonable fact finder may infer: (1) that the Board of Education in fact failed to enact a policy on providing AI services to the students within the UFSD; or (2) that the Landmark program could have been provided to B.D.S. as anything other than AI services absent any determination that B.D.S. qualified for EY services or that the Commissioner had ever approved the Landmark program as an EY services program. Accordingly, the branch of defendants' motion seeking summary judgment dismissing plaintiff's Section 1983 <u>Monell</u> claim

42

is granted and plaintiff's Section 1983 <u>Monell</u> claim is dismissed in its entirety with prejudice.

B.    IDEA Claim

1.    Standard of Review

"A summary judgment approach to IDEA cases * * * is different" than in other cases. <u>T.Y. v. New York City Department of Education</u>, 584 F.3d 412, 418 (2d Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 3277, 176 L. Ed.2d 1183 (2010). "Instead of dispute resolution, a motion for summary judgment can serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled." <u>Id.</u>; <u>see also</u> <u>T.P. ex rel. S.P. v. Mamaroneck Union Free School District</u>, 554 F.3d 247, 252 (2d Cir. 2009) ("Summary judgment in th[e] context [of an IDEA case] involves more than looking into disputed issues of fact; rather it is a pragmatic procedural mechanism for reviewing administrative decisions." (quotations and citation omitted)). "Though the court must show deference to administrative board findings, the court is also empowered to conduct an independent review of the record as a whole and even hear additional evidence." <u>T.Y.</u>, 584 F.3d at 418. With regard to the role of Rule 56.1 statements on a motion for summary judgment in an IDEA case, the Second Circuit has held that "[a] rule 56.1 statement, while not required, may assist the court's inquiry into whether IDEA procedures were followed and whether the result was reasonably designed to confer educational benefits. But while a Rule 56.1 statement may assist the court in reviewing particular issues, it is not in and of itself dispositive." <u>T.Y.</u>, 584 F.3d at 418. "The court's inquiry [on a motion for summary judgment] is a results-based standard in many respects, concerned more with a just outcome for a disabled student than with

43

judicial efficiency." Id.

The IDEA provides, in relevant part, that "* * * [a]ny party aggrieved by the findings and decision made [by the state review officer on appeal of the findings of fact and decision of an IHO], shall have the right to bring a civil action with respect to the [due process] complaint presented pursuant to this section, which action may be brought * * * in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). "In any action brought under th[e] [IDEA], the court– (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

Nonetheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo v. Arlington Central School District, 489 F.3d 105, 112 (2d Cir. 2007) (quotations and citation omitted); see also P. ex rel. Mr. and Mrs. P. v. Newington Board of Education, 546 F.3d 111, 118 (2d Cir. 2008); D.F. ex rel. N.F. v. Ramapo Central School District, 430 F.3d 595, 598 (2d Cir. 2005) (holding that judicial review of state administrative decisions under the IDEA is "strictly limit[ed].") "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." A.C. ex rel. M.C. v. Board of Education of Chappaqua Central School District, 553 F.3d 165, 171 (2d Cir. 2009) (quotations, alterations and citations omitted); see also Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley, 458 U.S. 176, 206,

102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982) ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. * * * The fact that [the IDEA] requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings."); P. ex rel. Mr. and Mrs. P., 546 F.3d at 118 ("Although school officials' decisions are subject to 'independent' judicial review, the responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. * * * [W]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings * * *." (quotations and citation omitted)). "[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States." Rowley, at 207, 102 S. Ct. 3034. "In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." Cerra v. Pawling Central School District, 427 F.3d 186, 191 (2d Cir. 2005).

The Supreme Court has held that in suits brought under the IDEA, the appropriate inquiry is two-fold: (1) whether the State complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures was "reasonably calculated to enable the child to receive educational benefits." Rowley, at 206-07, 102 S. Ct. 3034. If both of those requirements are met, "the State has complied with the obligations imposed by Congress and the courts can require no more." Id. at 207, 102 S. Ct. 3034.

45

Moreover, "[i]f a state fails in its obligation to provide a [FAPE] to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." Frank G. v. Board of Education of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006); see also Forest Grove School District v. T.A., 557 U.S. 230, 129 S. Ct. 2484, 2496, 174 L. Ed.2d 168 (2009) (holding that the IDEA "authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate * * * .") When a plaintiff seeks tuition reimbursement and either the procedural requirements of the IDEA have not been met or the school district has failed to provide the child with an FAPE, a court must also inquire into "whether the private schooling obtained by the parents [was] appropriate to the child's needs." T.Y., 584 F.3d at 417 (quoting Cerra, 427 F.3d at 192); see also T.P. ex rel. S.P., 554 F.3d at 252; Frank G., 459 F.3d at 363. The party commencing the administrative review bears the burden of persuasion as to the appropriateness of the child's IEP and the private services for which the parent is seeking reimbursement. See T.P. ex rel. S.P., 554 F.3d at 252; A.C. ex rel. M.C., 553 F.3d at 171-72; Gagliardo, 489 F.3d at 112.

### 2.    Substantive Violations

"By passing the [IDEA], Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." Rowley, 458 U.S. at 192, 102 S. Ct. 3034. The IDEA "imposes no clear obligation upon recipient States beyond the requirement that handicapped

children receive some form of specialized education * * *." Id. at 195, 102 S. Ct. 3034. "[T]he requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children." Id. at 198, 102 S. Ct. 3034 (quotations omitted); see also Cerra, 427 F.3d at 195 ("A school district is not * * * required to furnish every special service necessary to maximize each handicapped child's potential." (quotations and citation omitted)). "Rather, Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education." Rowley, 458 U.S. at 200, 102 S. Ct. 3034.

Under the IDEA, an FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Rowley, 458 U.S. at 188-89, 102 S. Ct. 3034; see also Frank G., 459 F.3d at 363 ("A free appropriate public education must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." (quotations and citations omitted)). "[S]uch instruction and services [must] be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP." Rowley, 458 U.S. at 189, 102 S. Ct. 3034. A child receives an FAPE "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied * * *." Id. "In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements

of the [IDEA] and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Id. at 203-04, 102 S. Ct. 3034.

The Second Circuit has held that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." Cerra, 427 F.3d at 195 (quotations and citation omitted); see also P. ex rel. Mr. and Mrs. P., 546 F.3d at 119 ("Under th[e] second 'substantive' prong of the Rowley test, * * * the door of public education must be opened in a 'meaningful way,' and the IEP must provide the opportunity for more than only 'trivial advancement.'" (internal quotations and citations omitted)); D.F. ex rel. N.F., 430 F.3d at 598 ("A valid IEP should provide for the opportunity for more than trivial advancement * * *, such that the door of public education is opened for a disabled child in a meaningful way." (quotations and citations omitted)). Courts "must examine the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." Gagliardo, 489 F.3d at 113 (quotations and citation omitted); see also Cerra, 427 F.3d at 195. "[I]n the regular classrooms of a public school system, the achievement of passing marks and regular advancement from grade to grade will be one important factor in determining educational benefit." Frank G., 459 F.3d at 364 (quoting Rowley, 458 U.S. at 207 n. 28, 102 S. Ct. 3034); see also Cerra, 427 F.3d at 196 ("[W]hen a learning-disabled child is in a mainstream class, the attainment of passing grades and regular advancement from grade to grade will generally constitute evidence of satisfactory progress." (quotations and citation omitted)).

"Moreover, there is a strong preference for children with disabilities to be educated, to the

maximum extent appropriate, together with their non-disabled peers." A.C. ex rel. M.C., 553

F.3d at 173 (quotations and citation omitted); see also Rowley, 458 U.S. at 202, 102 S. Ct. 30304

(holding that the IDEA "requires participating States to educate handicapped children with

nonhandicapped children whenever possible."); 8 N.Y.C.R.R. § 200.2(b) ("Each board of

education * * * shall adopt written policy that establishes administrative practices and

procedures: (1) to ensure that students with disabilities residing in the district have the

opportunity to participate in school district programs to the maximum extent appropriate to the

needs of the student * * * [and] (4) to provide special services or programs, to the extent

appropriate to the needs of the student, to enable the student to be involved in and progress in the

general education curriculum.") "Educating a handicapped child in a regular education

classroom . . . is familiarly known as 'mainstreaming'." P. ex rel. Mr. and Mrs. P., 546 F.3d at

119 (quotations and citation omitted). Mainstreaming is inappropriate, however, "where the

nature or severity of the handicap is such that education in regular classes cannot be achieved

satisfactorily." Id. (quotations and citation omitted). In determining whether an IEP places a

student in the least restrictive environment, courts should consider: (1) "whether education in the

regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily

for a given child, and, [2] if not, then whether the school has mainstreamed the child to the

maximum extent appropriate." Id. (quotations and citations omitted). With respect to the first

prong, the following factors are relevant: "(1) whether the school district has made reasonable

efforts to accommodate the child in a regular classroom; (2) the educational benefits available to

the child in a regular class, with appropriate supplementary aids and services, as compared to the

benefits provided in a special education class; and (3) the possible negative effects of the

inclusion of the child on the education of the other students in the class." Id. at 120.

Nonetheless, "this list of factors is not exhaustive; [and] courts * * * must engage in an

individualized and fact-specific inquiry into the nature of the student's condition and the school's

particular efforts to accommodate it, ever mindful of the IDEA's purpose of educating children

with disabilities 'to the maximum extent appropriate' together with their non-disabled peers." Id.

(quotations and citation omitted).

"Because administrative agencies have special expertise in making judgments concerning

student progress, deference is particularly important when assessing an IEP's substantive

adequacy." Cerra, 427 F.3d at 195; see also Frank G., 459 F.3d at 367 ("[A]n assessment of

educational progress is a type of judgment for which the district court should defer to the SRO's

educational experience, particularly where. . . the district court's decision was based solely on the

record that was before the SRO." (quotations and citation omitted)). "If the SRO's decision

conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished

weight.'" A.C. ex rel. M.C., 553 F.3d at 171 (quoting Gagliardo, 489 F.3d at 113 n. 2). Courts

must "'defer to the final decision of the state authorities,' even where 'the reviewing authority

disagrees with the hearing officer.'" Id. (quoting Karl ex rel. Karl v. Board of Education of

Geneseo Central School District, 736 F.2d 873, 877 (1984)).

IHO Lazan's and SRO Kelly's findings of fact and decisions were well-reasoned and

thorough and, therefore, deserve deference.[10] See, e.g. T.P. ex rel. S.P., 554 F.3d at 254; P., 546

F.3d at 118 ("Deference is particularly appropriate when . . . the state hearing officers' review has

---

[10] Since IHO Lushing's decision conflicts with SRO Kelly's decision, IHO Lushing's
decision is afforded diminished weight. See A.C. ex rel. M.C., 553 F.3d at 171.

been thorough and careful." (quotations and citation omitted)); Cerra, 427 F.3d at 196 (accord). Moreover, there is objective evidence in the record indicating: (1) that B.D.S. was likely to progress with the programs and services being offered within the UFSD by the CSE during the 2006-2007 academic year; (2) that the UFSD's recommendations were in accordance with the strong policy preference to educate students in the least restrictive environment appropriate to the student's needs and abilities; and (3) that B.D.S. did not qualify for EY services during the summer of 2007. The IEP for B.D.S. for the 2006-2007 academic year included daily resource room services, a daily one-to-one tutorial period with a special education teacher, individual reading remediation services twice a week and assistive technology and testing accommodations, such as a graphic organizer, Inspiration software program, preferential seating, a personal auditory enhancer and a laptop. Those special education services and supports being offered to B.D.S. within the UFSD were tailored to meet B.D.S.'s specific needs and were essentially similar, or more, than the services that had been provided to her during the previous academic year and from which B.D.S. had received significant educational benefit. Specifically, B.D.S. had performed at or above grade level in almost every area tested and had met grade level standards, advancing a grade each academic year, with the special education programs and services previously provided to her. Accordingly, the services and programs being offered to B.D.S., which increased the services previously provided to B.D.S. by increasing the frequency of the resource room component and adding one daily period of individual tutoring by a special education teacher, were likely to produce continued non-trivial progress during the 2006-2007 academic year and, thus, did not deprive B.D.S. of an FAPE. See, e.g. S.H. ex rel. W.H. v. Eastchester Union Free School District, 10-cv-3927, 2011 WL 6108523, at * 10 (S.D.N.Y. Dec.

8, 2011) ("Although past progress is not dispositive, it does strongly suggest that an IEP modeled on a prior one that generated some progress was reasonably calculated to continue that trend." (quotations and citations omitted)).

With respect to summer of 2007, B.D.S. did not qualify for EY services, insofar as there is nothing in the record indicating that she experienced any substantial regression during extended school breaks. In any event, plaintiff's failure to appeal IHO Lazan's January 19, 2007 decision finding that B.D.S. was not entitled to EY services and that her placement at Landmark during the summer of 2006 was "clearly temporary" precludes judicial review of that issue, absent any indication that pursuing an appeal before the SRO would have been futile. See, e.g. Coleman v. Newburgh Enlarged City School District, 503 F.3d 198, 204-05 (2d Cir. 2007); J.S. ex. rel. N.S. v. Attica Central Schools, 386 F.3d 107, 112 (2d Cir. 2004).

In sum, there is no apparent reason to second guess the reasonable determinations of IHO Lazan and the SRO: (1) that the UFSD had provided B.D.S. with an FAPE for the 2006-2007 academic year; and (2) that B.D.S. was not entitled to EY services at Landmark during the summer of 2007.


3.    Procedural Violations

Not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." A.C. ex rel. M.C., 553 F.3d at 172. "Rather, a procedural flaw necessitates a finding that a child was denied his or her right to a [FAPE] only if it results in the loss of an educational opportunity or seriously infringes the parents' opportunity to participate in formulating the IEP." J.G. ex rel. N.G. v. Kiryas Joel Union Free School District, 777 F.Supp.2d

606, 638 (S.D.N.Y. 2011); see also Matrejek v. Brewster Central School District, 471 F.Supp.2d 415, 419 (S.D.N.Y. 2007), aff'd, 293 Fed. Appx. 20 (2d Cir. 2008) ("Only procedural irregularities that cause substantive harm-meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP-constitute a denial of a FAPE."). In considering whether a school district satisfied the procedural requirements of the IDEA, courts must "focus on whether the [parents] had an adequate opportunity to participate in the development of [the] IEP." T.P. ex rel. S.P., 554 F.3d at 253 (alterations in original) (quoting Cerra, 427 F.3d at 192). "Parental participation requires an opportunity to examine records, participate in meetings, and to obtain an independent evaluation." T.L. ex rel. B.L. v. Department of Education of City of New York, No. 10-CV-3125, 2012 WL 1107652, at * 14 (E.D.N.Y. Mar. 30, 2012) (quoting Z.D. v. Niskayuna Central School District, No, 06-CV-1190, 2009 WL 1748794, at * 3 (N.D.N.Y. June 19, 2009)).

Plaintiff actively and meaningfully participated in the IEP process, had considerable input into the services and programs to be provided to B.D.S. for the 2006-2007 academic year and summer of 2007, obtained independent evaluations and was afforded the opportunity to examine all relevant records. The IEP from the May 26, 2006 annual CSE meeting, to which B.D.S.'s parents had consented, was provided to plaintiff in advance of the July 31, 2006 meeting, which was held to determine whether any adjustments should be made to the programs provided in the IEP following B.D.S.'s attendance at Landmark's summer program during the summer of 2006. Thus, plaintiff was afforded meaningful opportunity to review B.D.S.'s IEP for the 2006-2007 academic year, including the goals and objectives contained therein, and to raise objections and questions to the IEP. Notwithstanding that defendants offered to provide B.D.S. with the same,

53

or more, services and programs during the 2006-2007 academic year from which she had previously received educational benefit, plaintiff enrolled B.D.S. in Landmark. Plaintiff's "actions suggest that [she] seek[s] a 'veto' over school choice, rather than 'input'- a power the IDEA clearly does not grant [her]." T.Y., 584 F.3d at 420.

Moreover, services for B.D.S. for the summer of 2007 were discussed during the annual CSE meeting held on June 15, 2007, at which plaintiff actively participated, and B.D.S. was offered reading remediation three (3) hours per week for eight (8) weeks as an AI service during the summer of 2007, of which she failed to avail herself. Accordingly, any procedural irregularities during the development of the IEP or summer program were not significant enough to have rendered them legally inadequate. See, e.g. R.R. ex rel. M.R. v. Scarsdale Union Free School District, 615 F.Supp.2d 283, 292 (S.D.N.Y. 2009), aff'd, 366 Fed. Appx. 239 (2d Cir. 2010); T.L. ex rel. B.L., 2012 WL 1107652, at * 14; S.H. ex rel. W.H., 2011 WL 6108523, at * 6.

Since B.D.S.'s IEP for the 2006-2007 academic year was not procedurally flawed or substantively deficient, and she did not qualify for EY services during the summer of 2007, the branch of defendants' motion seeking summary judgment dismissing plaintiff's IDEA claims against the UFSD is granted and plaintiff's IDEA claims are dismissed in their entirety with prejudice.[11]

---

[11] In light of this determination, it is not necessary to consider the appropriateness of plaintiff's unilateral placement of B.D.S. at Landmark. See, e.g. T.P. ex rel. S.P., 554 F.3d at 254; A.C. ex rel. M.C., 553 F.3d at 173.

III.    Conclusion

For the reasons stated herein, defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted and all of plaintiff's remaining claims in this action are dismissed with prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff on all of the claims in the amended complaint.

Ingerman Smith is directed to advise the Court in writing, **on or before May 23, 2012,** whether it intends to prosecute its counterclaim against plaintiff, which is the only unresolved claim in this action, or its counterclaim will be dismissed with prejudice for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.

The Clerk of the Court is directed to service notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to the *pro se* plaintiff at her last known address, see Fed. R. Civ. P. 5(b)(2)(C).

SO ORDERED.

s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: May 9, 2012
          Central Islip, N.Y.